COMMONWEALTH *VS.* JIMMY J. SHERIFF.

Middlesex. February 3, 1997. - June 11, 1997.

Present: WILKINS, C.J., LYNCH, O'CONNOR, FRIED, & MARSHALL, JJ.

*Practice, Criminal,* Instructions to jury, Voluntariness of statement, Admissions and confessions. *Mental Impairment. Insanity. Evidence,* Admissions and confessions, Voluntariness of statement, Consciousness of guilt. *Constitutional Law,* Admissions and confessions.

At a murder trial, the judge's instruction to the jury with respect to the defendant's commitment status at Bridgewater State Hospital, blurring the distinction between a voluntary and an involuntary commitment, was contrary to the facts and was prejudicial to the defendant's defense of lack of criminal responsibility. [189-191]

At a murder trial in which the defendant raised the issue of his lack of criminal responsibility at the time of the homicide and his continuing mental illness thereafter, the judge should have submitted to the jury the issue of the voluntariness of the defendant's statements to police while he was hospitalized under arrest: where the error may have been prejudicial, the defendant was entitled to a new trial. [192-196]

At the retrial of a first degree murder case, if the defendant seeks to suppress certain statements on the ground that his Miranda rights were violated, a hearing should be held. [196-199]

At the retrial of a murder case, evidence that the defendant attempted to commit suicide would be admissible as evidence of consciousness of guilt. [199-200]

INDICTMENT found and returned in the Superior Court Department on March 17, 1987.

The case was tried before *James D. McDaniel, Jr.,* J., and a motion for a new trial was considered by him.

*Michael J. Traft (Leo McAuliffe* with him) for the defendant.

*Rosemary Daly Mellor,* Assistant District Attorney (*Adrienne C. Lynch,* Assistant District Attorney, with her) for the Commonwealth.

LYNCH, J. The defendant was convicted of murder in the first degree by reason of deliberate premeditation and extreme

atrocity or cruelty for the stabbing and bludgeoning death of his wife. On appeal, the defendant claims that (1) the judge improperly instructed the jury regarding his commitment to Bridgewater State Hospital; (2) the judge neither ruled on the question of the voluntariness of certain statements made by the defendant nor submitted the issue to the jury; (3) his Miranda rights were violated; (4) certain statements were improperly introduced as prior inconsistent statements; (5) the jury were improperly instructed that evidence of the defendant's attempted suicide may be considered as consciousness of the defendant's guilt; (6) the judge's instructions on deliberate premeditation and extreme atrocity or cruelty and malice were fatally flawed; and (7) the judge erred in denying his motion for a new trial without a hearing where the defendant was provided ineffective assistance of counsel. The defendant also asks that we exercise our power under G. L. c. 278, § 33E, to order a new trial. Because we conclude that the judge's instruction regarding the defendant's commitment to Bridgewater State Hospital was misleading and because he failed to instruct the jury on the voluntariness of an admission of the defendant, we conclude that there must be a new trial.

*Facts.* We set forth the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with certain issues raised. See *Commonwealth* v. *Nichypor*, 419 Mass. 209, 210 (1994); *Commonwealth* v. *Burnett*, 417 Mass. 740, 741 (1994). In the months before the murder, the defendant began to suspect that his wife was being unfaithful and wanted her to return to India, their native country, with him. Several times the defendant visited his wife at Malden Hospital, where she was a medical resident. There he interrupted her at work and accused her of being unfaithful. Other hospital employees observed the defendant and his wife arguing; at least twice hospital security was called because of the couple's arguments. The defendant was warned that he could be cited for trespassing if he caused disruptions in the hospital. According to the Commonwealth, because of the defendant's behavior, his sister was to come from California to escort him back to India.

On February 14, 1987, the victim did not report to work at the hospital for her scheduled shift. When asked to check her residence, police officers found the victim's body in the

bedroom. She had suffered fifty-three stab wounds in the chest, abdomen, leg, and groin area. In addition it appeared that the victim had been struck three times in the head. The wounds were consistent with having been inflicted by a knife and a wrench found at the scene. Wounds on her hands and forearms were characterized as defensive wounds.

The defendant was found lying unresponsive on the floor, apparently unconscious and foaming at the mouth. Inside the defendant's mouth were undigested pills. There was blood matching the victim's blood type on the defendant's shirt, pants, socks, and shoes. All doors to the apartment were locked from the inside. There were also numerous pills and prescription bottles strewn on the dining room table and on the floor around where the defendant had been lying. The bathroom sink faucet tested positive for the presence of occult blood and there was blood on the kitchen sink. The police immediately focused on the defendant as the primary suspect, and arrested him that evening at the hospital where he had been taken.

At trial the defense theory was that the defendant suffered from a major mental illness at the time of his wife's murder, and that if he committed the crime, he was not criminally responsible. The defendant testified that he had no memory of what happened in the apartment that day with respect to the killing; he was, however, able to recall the days leading up to the killing and denied that he would ever kill his wife, whom he considered to be his "goddess." The defendant further testified that his former employer had orchestrated a conspiracy against him, and evidence was presented that in the months prior to the killing the defendant had engaged in bizarre behavior as a result of his belief in this conspiracy.

Although the experts did not agree on whether the defendant was criminally responsible, they did agree that he suffered from a mental disease or defect. Two experts for the defendant testified that the defendant suffered from a major mental illness and could neither appreciate the criminality of his conduct nor conform it to the requirements of the law. An expert for the Commonwealth testified that the defendant had a mental disease but it was a paranoid personality disorder, not schizophrenia, and the defendant was criminally responsible for his actions. The Commonwealth's expert also testified that the defendant did not suffer from any command

hallucinations to kill his wife. In short, the Commonwealth agreed that the defendant suffered from a mental illness at the time of the crime, but questioned the severity of the illness. Moreover, the Commonwealth pointed out that the defendant did not believe his wife was part of the conspiracy against him, and argued that the defendant's motive for the killing, his belief that his wife was having an affair, was unrelated to the defendant's delusions.

*The judge's instructions to the jury regarding the defendant's commitment to Bridgewater State Hospital.* On direct examination, Dr. William Rohde, an expert witness called by the defense, told the jury that he had visited the defendant at Bridgewater State Hospital to determine his competency to stand trial. Dr. Rohde also made a reference to a "recommitment note" dated December, 1988, at which time the defendant's "legal status [had] changed." Concerned about the mention of competency examinations and commitment to the hospital, the judge instructed the jury that they were to disregard these references. The judge further admonished the jury that the defendant was not committed to Bridgewater State Hospital because he was mentally ill but because he had chosen to remain at the hospital.[1] Defense counsel objected to this characterization both before and after the instruction was given, and on appeal contends that the instruction was both contrary to fact and cannot be characterized as harmless.

As an initial matter, it is clear that the judge's statement to the jury was not accurate. While it is true that at the time of the trial, the defendant was at Bridgewater voluntarily, it is also true that at times relevant to the case, contrary to what the judge told the jury, the defendant had been involuntarily

---

[1]The judge stated: "[The witness], just a few moments ago, I believe mentioned that he in reviewing various reports he reviewed a report he characterized as a recommittal report. That recommittal is to be excluded. That has no bearing whatsoever on this case and as far as I'm concerned that has — that was, unfortunately, inadvertently revealed or brought to your attention. You're to exclude that. That has nothing to do with this case. In fact, there have been various references to the fact that . . . — in fact, as late as February of 1990 that [the defendant] was — that the doctor here examined him at Bridgewater. Aside from the fact that he was initially sent to Bridgewater for an evaluation out of the Waltham District Court, as has already been testified to, the fact that he's still at Bridgewater, it's not because he was committed there by any Court. He is there voluntarily and at the times relevant in this case. So that I bring to your attention. He's not been committed to Bridgewater for any mental illness."

committed to Bridgewater. Indeed, at least for the first half of 1989, the defendant was committed to Bridgewater State Hospital involuntarily pursuant to a court order issued under G. L. c. 123, § 16.[2] Because the instruction was objected to, we must consider whether the error was not prejudicial or whether, as the defendant argues, the instruction inappropriately minimized the severity of the defendant's mental illness.

It is well settled that a defendant has a right to place before a jury any evidence which is probative of his mental condition. See *Commonwealth* v. *Biancardi*, 421 Mass. 251, 255 (1995); *Commonwealth* v. *Mamay*, 407 Mass. 412, 420 (1990); *Commonwealth* v. *Louraine*, 390 Mass. 28, 34 (1983); *Commonwealth* v. *Schulze*, 389 Mass. 735, 740 (1983). There was evidence before the jury that the defendant had been acting irrationally for an extended period before the crime. The jury could have believed that an involuntary commitment to Bridgewater after the crime was further evidence of his lack of criminal responsibility as they may have considered his voluntary commitment as an attempt to bolster his defense.

---

[2]The history of the defendant's mental status is complicated. On March 25, 1987, the defendant had been committed for twenty days to Bridgewater State hospital pursuant to G. L. c. 123, § 15 (*b*), for a determination as to his competency to stand trial. Apparently, the defendant was found competent to stand trial by a doctor at Bridgewater and on April 14 was returned to the county jail. On April 17, 1987, however, he was recommitted for observation pursuant to G. L. c. 123, § 18 (*a*), after a doctor at the jail had deemed him psychotic, severely paranoid, and a suicide risk. Thereafter, the defendant was diagnosed with a major mental illness of depression with paranoid ideation and was deemed not capable of awaiting trial in a penal facility. Therefore, on June 11, 1987, the defendant was committed to Bridgewater pursuant to G. L. c. 123, § 18. That order was to expire on December 10, 1987; on December 23, 1987, however, the defendant was again recommitted for a period of time not to exceed one year. At this time, the defendant was diagnosed as having a delusional (paranoid) disorder of severe proportions. On November 28, 1988, the judge again ordered an evaluation of the defendant's competency to stand trial pursuant to G. L. c. 123, § 15 (*b*). Again, the defendant was diagnosed with paranoid schizophrenia and found not competent to stand trial. The court then ordered the defendant committed pursuant to G. L. c. 123, § 16 (*b*) and (*c*), on a petition filed by doctors at Bridgewater. The commitment was not to exceed six months and expired in June of 1989. At that time, it was determined that the defendant was competent to stand trial because of a significant improvement over the previous six months; it was recommended, however, that he voluntarily await trial at Bridgewater because of his "vulnerability to decompensate under stress."

Although the judge may have been properly concerned with the witness's reference to competency, *Commonwealth* v. *DeWolfe*, 389 Mass. 120, 123 (1983), the judge's instructions did more than just inform the jury that any references to competency were to be ignored. Rather, the judge's instructions blurred the distinction between a voluntary and an involuntary commitment which could have undercut the defendant's evidence of his mental state during the postarrest period. We have consistently held that the jury are "the sole judges of the credibility and weight of all of the evidence on the issue of insanity." *Commonwealth* v. *Louraine, supra* at 35, quoting *Commonwealth* v. *Kostka*, 370 Mass. 516, 536 (1976). By misleading the jury on the state of the defendant's mental illness after the crime, the judge infringed the defendant's right to have the jury fully consider his mental state before, during, and after the crime. *Commonwealth* v. *Callahan*, 386 Mass. 784, 792 (1982), citing *Commonwealth* v. *Bowden*, 379 Mass. 472, 486 (1980). Thus, the impact of the judge's instruction cannot be underestimated in a trial where a key issue was the severity of the defendant's mental illness.[3]

*Admission of statements made by the defendant in the hospital.* After being found unconscious at the scene of the crime, the defendant was taken to a hospital where he was placed in the intensive care unit. Later that night, police officers, including Sergeant Clare Schroeder of the Waltham police department and Trooper Joseph Lawless of the Massachusetts State police, went to the hospital, told the defendant he was under arrest, and read the defendant his Miranda warnings. The defendant was intubated and unable to speak. Two days later, on February 16, police officers again returned to the hospital. During this same visit, prior to readvising the defendant of his Miranda rights, Sergeant Schroeder asked the defendant "if he recalled that we had been there on Saturday evening." The defendant told Sergeant Schroeder that he

---

[3]We note also that, because the defendant's history is a complicated one, fairness to the defendant may require that, where the voluntary aspect of his commitment during a relevant time period is emphasized, the involuntary aspect of his commitment should also be explained. See *Commonwealth* v. *Callahan*, 386 Mass. 784, 791 (1982) (because judge felt it necessary to comment on a statute, fairness to the defendant required that he explain the statute fully, particularly where the judge's instruction undercut primary argument of defendant).

recognized her from previous encounters, including an encounter eight months prior and the encounter at the hospital the day he was arrested. Sergeant Schroeder also testified that the defendant recognized Trooper Lawless. The defendant was again informed of his Miranda rights but would not sign a card indicating that he understood his rights.[4] The defendant then asked the police officers where his wife's body was; the police officers informed the defendant that the defendant's sisters were making burial arrangements.

Prior to trial, the defendant moved to suppress statements the he made to a staff psychiatrist at Waltham Hospital on February 15. The motion raised the issue of voluntariness; ultimately, however, it appears that the statements were excluded as privileged under the psychotherapist-patient privilege. The judge made no written findings on the issue of voluntariness or on the claim that the defendant's Miranda rights had been violated. At trial, the defendant's statement that he recognized the police officer was offered by the Commonwealth to show that the defendant was in touch with reality when he killed his wife; the defendant's statements regarding his wife's burial arrangements were introduced by the Commonwealth on rebuttal after the defendant denied making the statements.

*The voluntariness of the statements.* The defendant argues that the statements made to the police officer while he was hospitalized are not voluntary because he was suffering from a mental illness at the time he made the statements. The defendant contends that a new trial is necessary because the judge did not rule that the statements were voluntary, and because, in accordance with the Massachusetts "humane practice" rule, the judge did not submit the issue of the voluntariness of the statements to the jury. The defendant did not object to the statement on voluntariness grounds, nor did the defendant request an instruction in accordance with the humane practice rule or object when no such instruction was given.

It is, of course, fundamental that a confession, or as in this case, an admission, whether made to police or to a civilian, is admissible only if it is voluntarily made. See *Commonwealth* v. *Benoit,* 410 Mass. 506, 511 (1991); *Commonwealth* v. *Allen,*

---

[4]This evidence was introduced at the motion to suppress hearing; it was not revealed to the jury.

395 Mass. 448, 456 (1985). "Statements that are attributable in large measure to a defendant's debilitated condition, such as insanity . . . are not the product of a rational intellect or free will and are involuntary" (citations omitted). *Commonwealth* v. *Allen, supra* at 455. See *Commonwealth* v. *Parker*, 402 Mass. 333, 340-341 (1988). Where the voluntariness of a defendant's statement is a live issue, such that evidence of " 'a substantial claim of involuntariness' is produced, a trial judge must conduct a voir dire on the question of voluntariness even though no such request has been made by defense counsel." *Commonwealth* v. *Brady*, 380 Mass. 44, 49 (1980), quoting *Commonwealth* v. *Harris*, 371 Mass. 462, 470 (1976). See *Commonwealth* v. *Hunter*, 416 Mass. 831, 834-835 (1994). If the judge concludes that the statements are voluntary, the issue of voluntariness must then be submitted to the jury for consideration if the question of voluntariness remains a live issue. *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982). The Commonwealth has the burden of proving to both the judge and the jury the voluntariness of the statements beyond a reasonable doubt. See *Commonwealth* v. *Hunter, supra*; *Commonwealth* v. *Allen, supra* at 456-457.

"The issue of insanity at the time of a confession can be raised by evidence of insanity 'prior to, during, and after the commission of the crimes,' at least where the confession takes place shortly thereafter." *Commonwealth* v. *Cole*, 380 Mass. 30, 40-41 (1980), quoting *Commonwealth* v. *Chung*, 378 Mass. 451, 457 (1979). "Thus, evidence of insanity usually raises the issue of voluntariness." *Commonwealth* v. *Cole, supra.* See *Commonwealth* v. *Vick*, 381 Mass. 43, 46 (1980) (where by end of trial there was substantial evidence of defendant's insanity at time he made certain statements, voluntariness of statements should have been submitted to jury on judge's own motion). In the instant case, there was a great deal of evidence regarding the defendant's impaired mental state presented at trial. Indeed, Dr. Daniel McPhail testified that, when he examined the defendant on February 17, 1987, three days after the crime was committed and one day after the statements in issue were made, the defendant "suffered from a major mood disorder, a major depression with . . . paranoid persecutory delusions." He therefore concluded that the defendant was mentally ill and should be further evaluated for

both competency and criminal responsibility at Bridgewater State Hospital, an examination that was then ordered by the trial judge. Dr. Rohde testified that he believed that at the time of the crime, the defendant lacked the ability to conform his conduct to the requirements of the law or appreciate the criminality of his acts. He also testified that at the time he examined the defendant, the defendant was still psychotic. The defendant's two sisters also testified to having witnessed irrational and bizarre behavior on the part of the defendant on various occasions prior to the commission of the crime. Therefore, in light of this evidence the voluntariness of the defendant's statements was a live issue. See *Commonwealth* v. *Vazquez*, 387 Mass. 96, 102-103 (1982); *Commonwealth* v. *Vick*, *supra*; *Commonwealth* v. *Cole*, *supra* at 41, quoting *Commonwealth* v. *Chung*, *supra* at 458 n.8 ("[i]n light of the extensive psychiatric evidence of involuntariness [insanity] which was presented at trial, . . . the judge had an independent obligation to instruct the jury to consider the voluntariness of the confession").[5]

Finally, we note that, while the Commonwealth argues that the defendant denied having made the statement and that any instruction regarding the voluntariness of the statement would have been inconsistent with the defense, we do not believe that the defendant's testimony, nor the defense strategy, can be so simply characterized. Indeed, the defendant not only testified that he would not have made such statements, he testified as well that he did not recall the time he spent in the hospital, testimony that may further call into question the

---

[5]We note that, while there was no evidence regarding the defendant's mental state precisely at the time the statements were made, we cannot ignore evidence regarding the defendant's mental state in the days immediately before and after the date the statements were made. Moreover, not only did the judge himself order the defendant committed to Bridgewater for observation just a few days after the killing, at the motion to suppress hearing held regarding statements made by the defendant on February 15, ample evidence regarding the defendant's mental state in the days immediately after the killing was presented. Indeed, the psychiatrist who examined the defendant on February 15 and on February 16, the day the statements at issue here were made, opined that, on February 16, the defendant, although in better control of his thought process, was still paranoid. The psychiatrist also testified that on February 16, the defendant was "more guarded, volunteered less information, and . . . that may well be due to the effects of the drug, wearing off, or it may be due to him settling down and realizing what the consequences of his actions were."

defendant's mental state at the time he made the statements. In addition, where the defense strategy clearly emphasized the defendant's mental state, such an instruction would not have been contrary to the theory and strategy of the defense.[6] Contrast *Commonwealth* v. *Nichypor*, 419 Mass. 209, 218-219 (1994) (voluntariness not live issue where defendant's claim at trial was that he did not make some statements testified to by police; therefore no substantial likelihood of miscarriage of justice); *Commonwealth* v. *Brady*, 380 Mass. 44, 51 (1980) (where defendant claimed voluntariness issue was raised because of evidence that he had been drinking, issue not live where focus of defense was alibi and evidence of intoxication not substantial); *Commonwealth* v. *Pratt*, 360 Mass. 708, 714 (1972) (voluntariness not raised with sufficiency to require express admonition to jury).

The judge erred in not determining the voluntariness of the defendant's statements and in not submitting the issue to the jury. Because we conclude that the error may have been prejudicial, we vacate the judgment and order that there be a new trial. The statements were elicited twice by the prosecutor. Moreover, they were referred to in closing arguments.[7] The statements were not confessions; we cannot say, however, that they would not have bolstered the prosecutor's contention regarding the defendant's sanity and influenced a jury's verdict on the issue of criminal responsibility as much as a confession would influence a jury in determining whether an individual had committed a crime. See *Commonwealth* v.

---

[6] In his closing argument, defense counsel argued that "[f]ifty-three stab wounds and a fractured skull are not consistent with sanity. That's insanity. Insanity. That's the work of a mad man, an insane person. An insane person."

[7] The prosecutor argued: "Consider the testimony that that night there sure were a lot of people in that intensive care unit, but the defendant was conscious, alert and oriented. He was able to observe things and to remember them. When two days later, he says to Clare Schroeder, 'I know you from Saturday and I know you from before. I remember you from Saturday and I know you from before. I remember you from Saturday, Trooper Lawless, but I never saw you, Tom Reilly, before.'

"That, ladies and gentlemen, is evidence that the defendant had an ability to remember and an ability to process information, and an ability to articulate it. And it shows that this man was capable of logical thinking. Just like the evidence concerning his question about proper burial, religious burial of his wife. It's thought content appropriate to the circumstances of a person dying."

*Hunter, supra* (new trial required where statements admitted without judge's determining question of voluntariness because jury might have concluded from statements that defendant was in control at time of killing); *Commonwealth* v. *Chung, supra* at 459-460 (where prosecutor referred explicitly to confession in closing to argue defendant's sanity and confession bore on the crucial issue of insanity, it could not be considered harmless even though overwhelming evidence defendant committed crime); *Commonwealth* v. *Tavares*, 385 Mass. 140, 152 (1982) (defendant's statement usually key item in proof of guilt and has overpowering weight with jury); *Commonwealth* v. *Johnston*, 373 Mass. 21, 25 (1977) (where confession bore on issue of whether defendant was legally insane, exclusion of evidence regarding confession was reversible error). Indeed, a determination and instruction regarding voluntariness is particularly important where, as here, there was testimony indicating that the statements were not inconsistent with the defendant's claim of lack of criminal responsibility.[8] See *Commonwealth* v. *Cole, supra* at 40-41 (where psychiatrists were of the opinion that defendant's statements were consistent with claim of lack of criminal responsibility question of voluntariness should have been submitted to jury).

*Issues that may arise in a new trial.* Because we conclude that there must be a new trial, we need not address all the remaining claims made by the defendant. We briefly discuss, however, those issues that are likely to recur at a new trial.

*The defendant's Miranda rights.* The defendant argues that his response to questions by the police at the hospital on February 16, 1987, indicating that he recognized certain police officers violated his Miranda rights because the statements are the product of a custodial interrogation and he was not adequately advised of his Miranda rights prior to being interrogated.[9] Indeed, the defendant argues that the Miranda warnings given on February 14 were stale by February 16, and

---

[8] Doctor Rohde testified that "[p]aranoid [s]chizophrenics, other than the system of delusions that they've set up are able to know who they are, where they are, what day it is. They'll know, you know, what their telephone number is and things like that are generally not affected. That's to say the orientational aspects of the brain functioning are not disturbed."

[9] Before the recognition statements were admitted in evidence, the defendant objected on the ground that his Miranda rights had been violated. Again, the defendant made no pretrial motion to suppress these statements,

therefore the statements he made indicating he recognized Trooper Lawless and Sergeant Schroeder, whom he had met before, and did not recognize then Assistant District Attorney Thomas Reilly, whom he had not met before, should not have been admitted at trial.[10]

As an initial matter, it is clear that it would have been better practice to have readvised the defendant of his Miranda rights prior to any interrogation on February 16, and the Commonwealth does not seriously contend otherwise. *Commonwealth* v. *Cruz,* 373 Mass. 676, 687 (1977) (Miranda warnings are not to be accorded unlimited efficacy). See *Commonwealth* v. *Harvey,* 390 Mass. 203, 205-206 (1983); *Commonwealth* v. *Silva,* 388 Mass. 495, 502 (1983); *Commonwealth* v. *Murray,* 359 Mass. 541, 544-545 (1971) (inculpatory statements inadmissible when made two days after Miranda warnings after which defendant requested attorney).

Miranda warnings are required only when a person in custody is subjected to either express questioning or its functional equivalent. *Rhode Island* v. *Innis,* 446 U.S. 291, 300-301 (1980). See *Commonwealth* v. *Torres,* 424 Mass. 792, 796-797 (1997).[11] Not all questioning falls within the Miranda doctrine. Miranda warnings are not required before routine background questions regarding a suspect's name, address, and related matters are asked of a suspect. This rule, called the "booking exception," has no strict applicability to the

---

and therefore failed to comply with Mass. R. Crim. P. 13 (c) (2), 378 Mass. 871 (1979). As we have stated before, however, "[e]ven if the defendant has not moved to suppress his statements the burden is still on the Commonwealth, upon seasonable objection, to prove affirmatively, prior to the admission of these statements, that the statements were properly obtained and that the defendant waived his rights." *Commonwealth* v. *Adams,* 389 Mass. 265, 269-270 (1983). See *Commonwealth* v. *Rubio,* 27 Mass. App. Ct. 506, 511 (1989).

[10]While the trial testimony is somewhat ambiguous, testimony from the motion to suppress hearing held regarding statements made on February 15 makes clear that the defendant was not readvised of his Miranda rights prior to making these statements on February 16. Moreover, the Commonwealth does not contest this point.

[11]There does not appear to be any dispute regarding whether the defendant was in custody. Indeed, he had been arrested on February 14 and guards were stationed in and around his room during his stay at the hospital.

facts of this case.[12] *Pennsylvania* v. *Muniz,* 496 U.S. 582, 602 (1990).[13]

The question remains, however, whether in the circumstances here, Sergeant Schroeder's words amounted to an interrogation requiring Miranda warnings.[14]

The Supreme Court has emphasized that, in order to determine whether a suspect has been subjected to custodial interrogation, the primary focus is on the suspect's perceptions rather than the police officer's intent. See *Pennsylvania* v. *Muniz, supra* at 601; *Rhode Island* v. *Innis, supra* at 301. Moreover, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island* v. *Innis, supra* at 300. This is so "because the purpose of the Miranda safeguards is to prevent 'government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment.' " *Commonwealth* v. *Torres, supra* at 797, quoting *Commonwealth* v. *Rubio,* 27 Mass. App. Ct. 506, 512 (1989). Ordinarily direct questioning would implicate Miranda concerns that interrogation and custody would "subjugate the individual to the will of his examiner" and undermine the privilege against self-incrimination. *Rhode Island* v. *Innis, supra* at 299, quoting *Miranda* v. *Arizona,* 384 U.S. 436, 457-458 (1966). It may be, however, that questions for the purpose of ascertaining whether the defendant is aware of his surroundings and can understand the Miranda warnings are in the same category as routine booking questions. *Pennsylvania* v. *Muniz, supra* at 601-602 (creating an exception to Miranda requirements for

---

[12]Of course, as the Supreme Court pointed out, "recognizing a booking exception to Miranda does not mean . . . that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's Miranda rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." *Pennsylvania* v. *Muniz,* 496 U.S. 582, 602 n.14 (1990).

[13]Indeed, there was testimony at trial that booking information includes a suspect's name, address, date of birth, and social security number.

[14]Sergeant Schroeder testified, "I indicated the two people who were with me [Trooper Lawless and then Assistant District Attorney Thomas Reilly] . . . and I asked him if he recalled that we had been there on Saturday evening." She also testified that when the defendant indicated that he remembered her from "before" she said, "You mean from Saturday night?" The defendant answered, "No, I remember you from before that." She then asked him "what he meant." Trooper Lawless also testified, "I identified myself, and I asked him if he remembered meeting me two days earlier."

routine booking questions where questions not designed to elicit incriminating responses).

Because there is to be a new trial, and if the defendant seeks to suppress these statements, there should be a hearing to address his claim that the police officers, aware of the possibility of the defendant's claim of insanity, asked him whether he recognized them in order to determine whether the defendant was oriented to person, place, and time, and to obtain an incriminating response.[15] Indeed, the "intent of the police is not entirely irrelevant, particularly where the challenged 'police practice is designed to elicit an incriminating response from the accused,' because it bears on whether the police should have known their words or actions were reasonably likely to have that effect." *Commonwealth* v. *Torres, supra* at 798, quoting *Rhode Island* v. *Innis, supra* at 301 n.7. See *Commonwealth* v. *Brant*, 380 Mass. 876, 883, cert. denied, 449 U.S. 1004 (1980).

*The suicide instruction.* The defendant argues that the judge should not have instructed the jury that, if they found beyond a reasonable doubt that the defendant attempted to commit suicide, it could be considered as evidence of the defendant's consciousness of guilt. We disagree.

Evidence of a defendant's attempt to commit suicide is admissible as evidence of consciousness of guilt. See *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 33 (1943); *Commonwealth* v. *Doe*, 8 Mass. App. Ct. 297, 302 (1979). We see no reason to depart from this rule despite the defendant's argument that individuals suffering from paranoid schizophrenia are ten times as likely as an individual not suffering from the disorder to commit suicide. Assuming that the defendant's contention is true, consciousness of guilt evidence may be admitted even though the defendant presents plausible alternative explanations for the conduct that are consistent with innocence of the crime charged. See *Commonwealth* v. *Booker*, 386 Mass. 466, 469-471 (1982); *Commonwealth* v. *Toney*, 385 Mass. 575, 584-585 (1982); P.J. Liacos, Massachusetts Evidence § 4.2.1, at 121 (6th ed. 1994 & Supp. 1995). It is, of course, defense counsel's job to argue the in-

---

[15]An incriminating response includes any response, inculpatory or exculpatory, which the prosecution might seek to use against the suspect at trial. *Commonwealth* v. *Torres*, 424 Mass. 792, 796-797 (1997), citing *Rhode Island* v. *Innis*, 446 U.S. 291, 301 n.5 (1980).

nocent explanation to the jury. *Commonwealth* v. *Knap*, 412 Mass. 712, 716-717 (1992) ("[c]onsciousness of innocence [is] a matter more appropriately left to the defendant's closing argument"). In any event, in the instant case, even though a judge is not required to point out to the jury a potentially innocent explanation for the act alleged to imply consciousness of guilt, the judge chose to give the jury a consciousness of innocence instruction.[16] There was no error.

The defendant's motion for a new trial should have been allowed. The judgment is reversed and the verdict set aside. The case is remanded for a new trial.

*So ordered.*

---

[16]The judge stated in part that "a defendant's conduct following or around the time of a crime may be motivated by factors which are fully consistent with innocence. In that connection, the conduct of the defendant in question in this case does not necessarily create an inference of guilt or feelings of guilt. The jury is permitted, but is not required to find that by his conduct the defendant has displayed some consciousness of guilt."