# United States Court of Appeals
## For the First Circuit

No. 11-1037

ERIC BROWN,

Petitioner, Appellant,

v.

STEVEN J. O'BRIEN,
Superintendent of Old Colony Correctional Center,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin, Selya and Howard,

Circuit Judges.

Catherine J. Hinton with whom Rankin & Sultan was on brief for appellant.
Jessica V. Barnett, Assistant Attorney General, Criminal Bureau, Appeals Division, with whom Martha Coakley, Attorney General, was on brief for appellee.

January 24, 2012

**BOUDIN**, <u>Circuit Judge</u>.  Eric Brown, now in state prison serving two life terms for first degree murder, was denied habeas corpus relief in the federal district court, <u>Brown</u> v. <u>O'Brien</u>, 755 F. Supp. 2d 335 (D. Mass. 2010), and now appeals. The factual background, recounted in detail in the state court decision upholding his convictions, <u>Commonwealth</u> v. <u>Brown</u>, 872 N.E.2d 711 (Mass. 2007), is readily summarized.

In the early morning of June 16, 1996, two men were shot at close range with a shotgun in Boston's South End and both were killed.  The day before the murders, Brown had accompanied his friend Dwight Bobbitt, a security guard who had the credentials to obtain firearms, to a Boston sporting goods store.  After Brown supplied Bobbitt with money, Bobbitt purchased a shotgun selected by Brown, together with shells, and turned both the weapon and the ammunition over to Brown. <u>Brown</u>, 872 N.E.2d at 716-17.  Bobbitt thereafter reported the shotgun as stolen, but later admitted he had purchased it for Brown. <u>Id.</u> at 716 n.15.

Then, sometime after midnight on June 16, 1996, Brown in the company of several friends (including Bobbitt) fired the shotgun into the air several times outside of his house in Roxbury. Brown was back inside the house when police arrived to investigate, and after they left he returned outside wearing a thigh-length green jacket and black boots.  Brown again fired into the air

several times and then left on foot toward Boston's South End carrying the shotgun with him.  Brown, 872 N.E.2d at 716-17.

Witnesses in the South End testified that in the early morning hours on Appleton Street, a number of people were outside socializing and walking about.  At about 3:30 in the morning, a man approached one of these people, Athos Oliveira, and shot him twice with a shotgun, the second shot hitting Oliveira in the face and killing him.  The assailant continued down the street, encountered one Thomas Meyer, killed him with a shot to the back of the head, and left the scene.  Brown, 872 N.E.2d at 717.

Five witnesses who either heard or saw one or the other of the two crimes--and who eventually testified at Brown's trial-- could not identify Brown as the man who killed Oliveira and Meyer. But most of the witnesses identified the assailant as a black male and one identified the assailant as having "short African-American hair"; another said he was wearing a green, three-quarter length jacket; two said that he was about 5'8'' or so (Brown was in fact 5'7''); and one said he was 160 pounds (Brown was 150 pounds). Although one said the jacket was waist-length, three agreed it was thigh-length.

Ten days after the crimes, on June 26, 1996, a policeman stopped Brown for erratic driving in a community not very far from Boston and eventually discovered a shotgun and a spent shell on the floor of the van he was driving.  Brown, 872 N.E.2d at 718.  Shell

-3-

casings recovered at the scenes where Oliveira and Meyer died were matched to the shotgun recovered from Brown's van; Bobbitt confirmed that this was the weapon he had bought and also that a green jacket that police found in Brown's apartment matched the color of the one Brown had worn on the night of the shootings.

Brown was indicted in August 1996 but was not put on trial until March 2001. In the interim, Brown was committed to Massachusetts' Bridgewater State Hospital ("Bridgewater") for an extended period to determine his competence to stand trial. Successive conflicting determinations as to competency followed along with re-commitments for more observation.[1] Finally, after hearings in January and March 2001, he was twice determined to be competent to stand trial by the state judge, although defense experts and a court clinician disagreed. A trial commenced in late March 2001 and lasted for four weeks.

At trial, the principal defense witness (Dr. Rosmarin), a forensic psychiatrist from Massachusetts General Hospital, testified that Brown was a paranoid schizophrenic who exhibited prominent symptoms of the disease and suffered from delusions of persecution, a horror of homosexuality, and voices telling him to

---

[1]Brown was initially found competent to stand trial in February 1997 but was then re-committed to Bridgewater at its request for further observation and treatment. After further hearings and evaluations, he was held incompetent to stand trial in April 1998 and re-committed to Bridgewater. Brown was then held competent in December 1998 but then re-committed for further observation.

kill those he believed to be "sexual immoralizers." He also gave his opinion that at the time of the deaths, Brown was not sane and lacked criminal responsibility under the standard used in Massachusetts.[2]

Two treating psychiatrists and a treating psychologist from Bridgewater agreed that Brown was a paranoid schizophrenic suffering from delusions, and described the symptoms they had observed during his time at Bridgewater. Supporting evidence from friends and family members confirmed Brown's mental and emotional deterioration in 1995 and 1996. But several witnesses for the prosecution testified on rebuttal that Brown seemed normal to them both before and after the killings and the prosecution's expert testified, albeit rather summarily and after limited exposure to him, that Brown was not psychotic on the day of the shootings.

The jury convicted Brown in 2001 of two separate counts of first degree murder, as well as other less serious firearms-related offenses, and on each murder count he received a life sentence. The Supreme Judicial Court of Massachusetts ("SJC")

---

[2]Commonwealth v. DiPadova, 951 N.E.2d 891, 897 (Mass. 2011) ("Under the McHoul test, a defendant is not criminally responsible for his actions—and, therefore entitled to a verdict of not guilty—if, at the relevant time and due to a mental illness (mental disease or defect), he lacks the substantial capacity to appreciate the wrongfulness of an action or to act in conformity with the law." (citing Commonwealth v. McHoul, 226 N.E.2d 556 (Mass. 1967))).

affirmed the conviction.  Brown, 872 N.E.2d 711.  Brown then filed a habeas petition in the federal district court, 28 U.S.C. § 2254 (2006).  The magistrate judge recommended that the habeas petition be dismissed on the merits, and the district judge agreed, but also granted a certificate of appealability as to four different issues, which are now before us.  Brown, 755 F. Supp. 2d at 337.

A federal court may grant a writ of habeas corpus when a state court adjudication resulted in a decision "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d)(1)-(2).[3]  There are additional provisions relating to factual issues, id. § 2254(e)(1), but any ambiguity resulting from the interaction of the factual provisions, see Wood v. Allen, 130 S. Ct. 841, 848-49 (2010) (noting circuit split), does not impact the outcome here.

Sufficiency of the evidence.  Brown's first argument is that under Jackson v. Virginia, 443 U.S. 307 (1979), no reasonable jury could find that he is the person who committed the murders.

_____

[3]Under the "law" prong, a state court's decision is "contrary to" federal law either if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 413 (2000).  Review under the "fact" prong is limited to "the record that was before [the] state court."  Cullen v. Pinholster, 131 S. Ct. 1388, 1400 (2011).

-6-

The SJC rejected this claim on the merits, Brown, 872 N.E.2d at 723-24, so our review is deferential. But, in this instance, deference to the state court is beside the point: if an identical insufficiency of evidence claim were made on direct appeal after a federal trial, the evidence would be entirely sufficient to support a jury verdict finding that Brown shot the two victims.

Brown says the prosecution established, at most, "circumstantial evidence" connecting Brown and the gun used in the shootings. The prosecution's case was "circumstantial" in the limited sense that no one at the scene testified in court to recognizing Brown as the shooter; but there was direct eyewitness evidence (1) that the man was similar to Brown in race, height, weight, hair style and green jacket; (2) that Brown left for the South End with his shotgun an hour or two before the murders; (3) that he possessed that shotgun less than two weeks later; and (4) that the shell casings at the scene matched his weapon.

True, the credibility of Bobbitt (who testified to the purchase of the gun and the incident in front of Brown's house before the murders) was open to attack, although his version of the gun purchase was not effectively challenged. The eyewitness testimony as to identity of the shooter was in some respects vague; and certainly the jury could have doubted Brown's sanity. But this last issue is not before us and Brown's plainly disturbed personality, if the disturbance fell short of insanity, provided an

explanation for what otherwise might be viewed as a senseless, and therefore improbable, crime.

Brown's counsel at trial conceded to the jury in closing that Brown had done the shootings, and sensibly concentrated on persuading the jury that Brown was insane. In his presentation of the case, defense counsel provided strong expert and lay testimony that Brown was insane which would likely have persuaded many juries--especially because the prosecution had a bare minimum of expert evidence on its side and appeared to rely heavily on the doubtful inference that Brown cannot have been insane because he was fairly organized and systematic.

However, under the Massachusetts standard (see note 2, above), showing a severe mental illness is not conclusive; the jury must also decide whether the illness prevented the defendant from appreciating the wrongfulness of his actions or conforming his conduct to the requirements of the law. Commonwealth v. DiPadova, 951 N.E.2d 891, 897 (Mass. 2011). The main defense expert said Brown met this standard; the prosecution expert said that Brown was not even psychotic on the day of the murders; and the SJC upheld the jury verdict. Brown, 872 N.E.2d at 731. The insanity issue was not pressed in the habeas proceeding.

Instead, in this court, Brown presses his attack on the sufficiency of the identification evidence along two lines. First, counsel points out that under Massachusetts law, the evidence can

be found insufficient based solely on what is presented in the prosecutor's opening case (if the defendant files a motion at the close of the prosecution's case);[4] and, on this premise, Brown's counsel urges that Jackson should be applied so as to disregard any evidence that came in only later through the defense case or prosecution rebuttal--where a limited amount of evidence adverse to Brown was admitted.

But this Massachusetts practice is not imposed by federal constitutional law. See LaMere v. Slaughter, 458 F.3d 878, 882 (9th Cir. 2006); Hernandez v. Cowan, 200 F.3d 995, 998 (7th Cir. 2000). And Jackson does not say or even suggest that its test is to be applied to the prosecution's case but asks instead whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 318-19. Accord McDaniel v. Brown, 130 S. Ct. 665, 672 (2010).

Second, Brown relies on O'Laughlin v. O'Brien, 568 F.3d 287 (1st Cir. 2009), cert. denied, 130 S. Ct. 1142 (2010), where

---

[4]Mass. Crim. Pro. R. 25(a); see also Commonwealth v. Berry, 727 N.E.2d 517, 522 (Mass. 2000). By contrast, under federal practice (and in the majority of states) a defendant can challenge the government's opening case after it is presented but, if the defendant then puts on his own case, any challenge to the sufficiency of the evidence must be based on the full record including anything presented in the defense case. See State v. Perkins, 856 A.2d 917, 932 n.23 (Conn. 2004) (listing federal and state practices).

this court on habeas review upheld a <u>Jackson</u> challenge.  In that case, the defendant was directly connected with a vicious assault only by some small blood stains in the defendant's apartment linked by DNA testing to him--not the victim--and his baseball bat--presumptively the murder weapon--found in the woods, also with blood stains which yielded no conclusive results after DNA testing. <u>Id.</u> at 294.

In practice, <u>Jackson</u> challenges are rarely upheld on habeas and <u>O'Laughlin</u> is a rare exception.  The evidence showing that Brown committed the crime, described above, was far stronger than in <u>O'Laughlin</u>.  The only truly close issue as to guilt was Brown's sanity, and, as noted earlier, that issue was resolved against Brown based on what can charitably be regarded as conflicting expert evidence, and anyway that issue is not before us.

<u>Intoxication</u>.  Brown does raise a related state of mind issue on this appeal.  Specifically, Brown claims that the trial court should have granted his request for a jury instruction on intoxication. At trial, psychiatrists for both the defense and the prosecution made mention of Brown's drinking on the night of the crimes.  But, although Brown submitted a written request for an intoxication instruction, the trial judge's instructions to the jury did not include one on intoxication. <u>Brown</u>, 872 N.E.2d at 728 & n.39.

-10-

Massachusetts defines first degree murder as requiring premeditated malice, Mass. Gen. Laws ch. 265, § 1, and it endorses a jury instruction allowing the jury to consider intoxication to negate the required scienter; but such an instruction is required only when there is evidence presented of intoxication so debilitating it prevents the defendant from forming the requisite intent. Commonwealth v. Morgan, 663 N.E.2d 247, 250-51 (Mass. 1996). On direct appeal, the SJC found there was no such evidence in this case. Brown, 872 N.E.2d at 727-28.

Brown's principal claim here is that the "no such evidence" ruling was an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). Ordinarily, errors of state law are not the basis for federal habeas relief, Estelle v. McGuire, 502 U.S. 62, 71-72 (1991); Pulley v. Harris, 465 U.S. 37, 41 (1984), but Brown also argues that the failure to give the instruction where the facts and law made it appropriate violated his due process rights.[5] In all events, no evidence of disabling intoxication was presented in this case--or at least the state court could permissibly so find.

---

[5]See generally In re Winship, 397 U.S. 358, 364 (1970)("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime."); see also Gilmore v. Taylor, 508 U.S. 333, 343-44 (1993); Sandstrom v. Montana, 442 U.S. 510, 512-14, 521 (1979); Commonwealth v. Vives, 854 N.E.2d 1241, 1243-45 (Mass. 2006).

True, Brown points to testimony of the prosecution and defense psychiatric experts--Dr. Rogers and Dr. Rosmarin--both of whom adverted to statements Brown himself made during their examinations that he had drunk vodka and beer on the night of the murders; Dr. Rosmarin also mentioned some intake of marijuana; and Dr. Rogers, negating insanity, referred to Brown's "drinking excessively" (and homophobia) to explain the killings.

But Brown's statements to the doctors were admitted only to disclose the basis for their expert opinions on sanity and not for the truth of Brown's statements. Brown, 872 N.E.2d at 728. The distinction was conveyed to Brown's jury and is not directly challenged in this case. Commonwealth v. Sama, 582 N.E.2d 498, 502 (Mass. 1991), cited to us by Brown, did require an instruction but there the expert gave his own opinion that the defendant might have been hallucinating at the time of the crimes as a result of substance abuse.

Thus, strictly speaking, practically no evidence of Brown's drinking was properly before the jury.[6] Even if the statements were considered as substantive evidence, the SJC pointed out that

_____

[6]The prosecutor seems to have ignored the distinction in his closing by arguing that drinking and marijuana, rather than insanity, might have explained Brown's actions; but no objection was made by the defense; and the SJC held that "to the extent the argument was improper, it did not create a substantial likelihood of a miscarriage of justice." Brown, 872 N.E. 2d at 728 n.41.

-12-

> none of this evidence--or any other evidence admitted at trial--demonstrated how much or for how long Brown had been drinking on the night of the shootings or what effect any alcohol that he may have ingested had on him or whether his ability to form the requisite criminal intent was impaired.

Brown, 872 N.E.2d at 728 (internal citation omitted). Assuming a federal issue exists, the state court's fact-based assessment rejecting such an instruction was not "unreasonable," given the lack of any specific testimony about a debilitating impact. Wood, 130 S. Ct. at 849.

Competence. Brown's third argument on habeas is that he was not competent to stand trial, or at least that the procedures used to determine his competency were defective. Competence to stand trial is a narrowly focused concept: a defendant may have all kinds of mental afflictions, but he can avoid trial only if he lacks "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and . . . a rational as well as factual understanding of the proceedings." Dusky v. United States, 362 U.S. 402, 402 (1960).

As already explained, after his arrest Brown was for several years confined to Bridgewater. The competency determination now before us was initially made in January 2001 and then reaffirmed after a hearing in March 2001 shortly before trial. The finding was made despite affidavits from Brown's counsel stating that Brown was "unable to consult with his attorneys with

-13-

a reasonable degree of rational understanding" and did not have a rational understanding of the proceedings against him.

The defense expert, Dr. Price, based on examinations in February and March 2001, agreed. She stated that Brown was suffering from chronic paranoid schizophrenia, was delusional, believed he was the Anti-Christ, and heard voices. She said that Brown appeared to have deteriorated significantly since his last evaluation, was inattentive, and would have serious difficulties following the proceedings and preparing a defense. She also said that Brown would likely substantially improve if he resumed medication.[7]

The court's clinical psychologist evaluated Brown on March 7, and also found him incompetent. He summarized his review of Brown's past evaluations as follows:

> [T]he prevailing clinical opinion is that [Brown] indeed can be competent, particularly when he is appropriately medicated. Under the influence of anti-psychotic medication his symptoms are significantly improved although never completely absent. . . . [H]is competency can fluctuate under a number of different conditions.

---

[7]Brown ceased taking medication in mid-February 2001 (before Dr. Price's first evaluation) so that he could "concentrate more easily on court proceedings"; another state judge ordered Brown be forcibly medicated on March 14, the day after the first day of the competency hearing. In Massachusetts, "a distinct adjudication of incapacity to make treatment decisions (incompetence) must precede any determination to override patients' rights to make their own treatment decisions." Rogers v. Comm'r of the Dept. of Mental Health, 458 N.E.2d 308, 314-315 (Mass. 1983).

-14-

The psychologist reported that while Brown could respond well to short, concrete questions, he could not process questions that were longer or complex. He concluded that Brown could understand only simple concepts, did not have more than a superficial understanding of key legal processes (for example, he could name the two possible defenses as "Not guilty by Insanity" and "Not-There" but could not explain how he might choose between the two), and was not currently competent and would only worsen without medication.

After receiving these reports, the judge ordered another evaluation by the Commonwealth's expert, a forensic psychiatrist. Dr. Annunziata met with Brown for two evaluations (both when Brown was still un-medicated), and testified that Brown was competent to stand trial. Dr. Annunziata said that while Brown did hear voices, they were not overly distracting, and that during the evaluation, Brown was able to concentrate and focus, had a good short-term memory, and showed no "gross impairment in judgment."[8]

Despite further defense testimony by Dr. Price after another brief interview with Brown, the trial judge ruled on March 23, 2001, that Brown was competent, expressly relying solely on Dr.

---

[8]However, Dr. Annunziata admitted that he had not reviewed Brown's medical records from his four-and-a-half years at Bridgewater, and that he did not ask Brown "many complex questions." He also testified that when Brown's attorney asked him a moderately complex question--specifically, whether Brown remembered three motions from a hearing the day before--Brown could not recall any.

-15-

Annunziata's testimony, to which he gave "great weight and credit," and his own observations of the defendant's conduct during the competency hearing. On direct appeal, the SJC upheld Brown's competency, finding that determination within the province of the trial judge who heard the witnesses and observed the defendant. Brown, 872 N.E. 2d at 722-23. The question for us is whether this result is so clearly unreasonable that it should be set aside.

Habeas challenges to state competency findings fail with remarkable regularity, 40 Geo. L.J. Ann. Rev. Crim. Proc. at 468 n.1432 (2011) (citing cases), partly because habeas review is deferential and partly because the trial judge has seen the witnesses and the defendant. E.g., United States v. Figueroa-Gonzalez, 621 F.3d 44, 48 (1st Cir. 2010). The ability to understand the proceedings and assist counsel is both a matter of degree and one in which trial judges, as well as health professionals, have pertinent expertise. See United States v. Ahrendt, 560 F.3d 69, 75 (1st Cir. 2009), cert. denied, 129 S. Ct. 2815.

Here, Brown was surely impaired and, at the same time, all experts agreed that he at least possessed some understanding of the situation and some ability to reason about it and discuss issues with counsel.[9] No one knows just how to measure precisely

_____

[9]Mental illness, limited intelligence, emotional troubles and even amnesia as to pertinent events afflict many defendants, and they do not automatically prevent a defendant from being tried or

-16-

that "sufficient present ability" to consult and understand of which the Supreme Court spoke in Dusky.  And, of course, a defendant who refuses medication can worsen his own condition until forcibly medicated; Brown, as it happens, was required to resume medication before his trial commenced.  See note 7, above.

A raving lunatic may not be tried, however patently guilty and however hopeless his defense.  But Brown is in a gray area, somewhat impaired; and although "prejudice" is not part of the equation, it is hard to see what more Brown could have contributed to the thorough "all fronts" defense he received. Competence to stand trial, as defined by the Supreme Court, is decidedly a functional concept.  In the end, the state court finding was contestable, but it was not "unreasonable" under the deferential habeas standard.

Brown also brings a procedural claim relating to competency, saying that due process obliged the trial judge, as the defense requested, to review Brown's Bridgewater medical records and a tape of the Rogers hearing relating to forced medication, see note 7, above, before ruling on competency.  But one of Brown's experts testified at the hearing to the contents of his medical records and the other two had worked with him at Bridgewater; one

_____

pleading guilty.  E.g., United States v. Rodríguez-León, 402 F.3d 17 (1st Cir. 2005) (limited intelligence); Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245 (11th Cir. 2002) (mental illness), cert. denied, 538 U.S. 906 (2003); Wilson v. United States, 391 F.2d 460 (D.C. Cir. 1968) (amnesia).

of those had recommended that the Rogers hearing be held and testified there.  Brown has not pointed to any additional specific information (material or otherwise) that would have been revealed.

In a further procedural challenge, Brown argues that after the court clinical psychologist found him incompetent on March 7, 2001, Massachusetts law mandated an additional extended observation and evaluation at Bridgewater before determining competency.  Mass. Gen. Laws ch. 123, § 15(b).  As the SJC pointed out, section 15(b)'s language is permissive, not mandatory, and it was reasonable to find that in light of the already-completed evaluations and extensive medical record, no further observation was "necessary."  Brown, 872 N.E.2d at 760.

Voluntariness.  Finally, Brown claims that the district court violated due process by failing to hold a sua sponte hearing on the voluntariness of various statements made by Brown--seemingly statements he made between June 15 (the day before the killings) and June 26, 1996 (the day he was apprehended outside of Boston).  These statements, which came into evidence through the testimony of various prosecution witnesses, are not directly quoted in Brown's brief, but are listed in a similar claim made in the SJC.  Brown, 872 N.E.2d at 725 n.35 (listing statements).

These included Brown asking Bobbitt to purchase a shotgun for him the day before the killings and indicating the one he wanted, and a denial of involvement to Bobbitt the day after;

-18-

statements made on June 18 (two days after the murders) to an acquaintance, Samuel Lewis, indicating Brown was talking and acting normally; and statements to the police officers who apprehended Brown after a traffic stop outside of Boston (including both answers to routine booking questions and Brown's statements when stopped for the traffic violation that he was returning from a party after dropping two girls at home).

The judge allowed the statements in evidence over a defense objection after ruling (outside of the presence of the jury) they were made voluntarily, but ultimately instructed the jury that it should determine whether the statements were voluntary and must disregard any statement that was not voluntary. Brown argues that the judge erred in not holding a separate sua sponte voluntariness inquiry in light of the evidence of his mental illness at the time the statements were made.

Massachusetts law so requires under certain conditions, Commonwealth v. Sheriff, 680 N.E.2d 75, 79-80 (Mass. 1997), but the SJC held none was required here (and the trial court ultimately instructed the jury to determine the voluntariness of the statements), Brown, 872 N.E.2d at 726-27. As we explained earlier, state law errors are not independent bases for habeas review. Given the context of the statements, it is far from clear that a federal constitutional issue could be made out. See, e.g., Colorado v. Connelly, 479 U.S. 157 (1986).

-19-

In any case, the most critical of the statements initially contested appear to be those made to Bobbitt while purchasing the gun for Brown, but the SJC held these statements--to which Bobbitt himself testified--were not subject to voluntariness analysis because they were "part and parcel of the crime."  Brown, 872 N.E.2d at 726.  The other statements of Brown, made to witnesses who testified to his seeming rationality, merely provided the basis for their own assessment and--in a debatable case--are admissible under state law.  Sheriff, 680 N.E.2d at 79-80.

Affirmed.