# United States Court of Appeals
## For the First Circuit

No. 08-1010

MICHAEL O'LAUGHLIN,

Petitioner, Appellant,

v.

STEVEN O'BRIEN,
Superintendent, Old Colony Correctional Center,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Baldock,* and Howard,
Circuit Judges.

Kenneth I. Seiger, for appellant.
Scott A. Katz, Assistant Attorney General, Criminal Bureau,
with whom Martha Coakley, Attorney General, was on brief for
appellee.

June 10, 2009

_____

*    Of the Tenth Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**. On the morning of November 17, 2000, Annmarie Kotowski ("Mrs. Kotowski") was found in her apartment severely beaten and covered in blood. She survived, but could not remember the details surrounding the attack or the person who attacked her. After an investigation, police identified Petitioner-Appellant Michael O'Laughlin as the perpetrator.

A Massachusetts Superior Court jury subsequently convicted O'Laughlin of the following counts: (1) burglary and armed assault in a dwelling; (2) armed assault in a dwelling; (3) armed assault with intent to murder; and (4) assault and battery by means of a dangerous weapon. The Superior Court then sentenced O'Laughlin to 35-50 years on Counts One and Two; 19-20 years on Count 3; and 9-10 years on Count 4, ruling that the sentences were to be served concurrently. The intermediate Massachusetts Appeals Court reversed the judgments holding that there was insufficient evidence to support the verdicts. Commonwealth v. O'Laughlin, 830 N.E.2d 222 (Mass. App. Ct. 2005) (hereinafter "O'Laughlin I"). The Massachusetts Supreme Judicial Court ("SJC") reinstated the judgment reasoning that there was sufficient evidence to support the verdicts. Commonwealth v. O'Laughlin, 843 N.E.2d 617 (Mass. 2006) (hereinafter "O'Laughlin II").

O'Laughlin filed a petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts on grounds that (1) the SJC's ruling was objectively

unreasonable because there was insufficient evidence to support a guilty verdict and (2) that the SJC violated his constitutional right to present a defense. The district court denied O'Laughlin's petition for habeas relief. After careful consideration, we reverse the judgment of the district court and order the district court to grant the petition.

## I. **Background**

### A. **Factual Summary**

"We must 'accept the state court findings of fact unless [O'Laughlin] convinces us, by clear and convincing evidence, that they are in error.'" Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir. 2006) (quoting McCambridge v. Hall, 303 F.3d 24, 26 (1st Cir. 2002) (en banc)); see also 28 U.S.C. § 2254(e)(1). We note that the SJC's findings of fact may be "supplemented with other facts from the record that are consistent with the SJC's findings." Lynch, 438 F.3d at 39; see also Healy v. Spencer, 453 F.3d 21, 22 (1st Cir. 2006). Thus, we recount the facts largely as they were presented in the SJC's opinion.

In May 2000, Mrs. Kotowski revealed to David Kotowski ("Mr. Kotowski"), her husband of over twenty-five years, that she was romantically involved with James Finn. In September 2000, Mrs. Kotowski moved out of her home into the Fox Hollow condominium

complex in a neighboring town.[1] She resided alone. O'Laughlin, a member of Fox Hollow's maintenance staff, lived two doors down from Mrs. Kotowski. Like other members of the maintenance staff, he possessed a master key to all the buildings on the property, including a key to Mrs. Kotowski's apartment.[2]

The SJC noted that O'Laughlin "took some interest" in Mrs. Kotowski prior to the attack. For example, when Mrs. Kotowski's sister was visiting, O'Laughlin stood outside her apartment and asked Mrs. Kotowski if there were "any more good looking women in there[.]" Also, he referred to Mrs. Kotowski five or six times in conversations with acquaintances, citing her "beautiful antique furniture" in her apartment as evidence of her wealth and remarking that he was attracted to her "body type."[3]

The day before the attack, O'Laughlin cashed a $457.16 paycheck and made $200 child support payment to his ex-wife. Also, the SJC stated that O'Laughlin was agitated when he was unable to

_____

[1] The SJC indicated a "difficult" marital situation: "Both the victim and her husband characterized their relationship as friendly but strained. (Other witnesses described the husband's attitude as alternating between loving and angry.)" Approximately a week before the attack, she conversed for the first time with her husband about the possibility of getting a divorce. Mrs. Kotowski testified that Mr. Kotowski was "crushed" by the move.

[2] O'Laughlin had been inside Mrs. Kotowski's apartment at least once previously in September to fix a window, among other tasks.

[3] In addition, the SJC states that just days before the attack, one acquaintance testified that O'Laughlin had "really scared" Mrs. Kotowski by inquiring "about the window in her apartment." However, once Mrs. Kotowski realized he was on the maintenance staff, she simply walked away.

-4-

sell his trailer to his neighbor because the neighbor could not come up with $500. The neighbor paid him the next day.

On the night of the attack, the SJC described O'Laughlin as "[n]ervous, jittery, [and] paranoid . . . ." This was "typical behavior when he smoked crack cocaine," which O'Laughlin had done earlier that evening at the home of a friend, Mark Puleri.

As the night wore on, O'Laughlin was "depleted of drugs and most of his cash." At 9:00 or 9:30 p.m. that evening, O'Laughlin, now at home alone, telephoned another friend, Grover Finkle, asking him for a ride to purchase drugs. Finkle, who was at Richard O'Leary's house, had previously smoked crack cocaine with O'Laughlin and knew a drug dealer. Finkle and O'Leary, a taxicab driver, arrived at O'Laughlin's apartment an hour later. However, they soon left without giving O'Laughlin a ride because O'Laughlin was unable to secure money for cab fare.[4]

In the early morning hours of November 17, between 12:10 and 1:43 a.m., fourteen telephone calls were placed to or from O'Laughlin's apartment. The majority of these calls were placed to known drug dealers.

Shortly before 2:00 a.m. George Whittemore, a neighbor living directly above Mrs. Kotowski, awakened to a woman screaming directly below and the sound of "wood hitting wood." According to

---

[4]  O'Leary refused to drive unless O'Laughlin provided him with an advance payment.

-5-

Whittemore, a carpenter by profession, these sounds lasted for about thirty seconds.

Whittemore dialed 911 at 1:55 a.m. He stayed awake until the police arrived and flashed his apartment lights to indicate his apartment to the police. Between the time he called 911 and when the police arrived, Whittemore did not hear any vehicles arrive or depart from the area. The police later conducted a reenactment of the 911 call. Based on this reenactment, they concluded that a person standing in Mrs. Kotowski's bedroom could have heard Whittemore's footsteps as he walked to the telephone as well as Whittemore's voice, but would have been unable to make out what was being said.

Officers William Tierney and Phillip Skowron arrived six or seven minutes after Whittemore's 911 call. They were unable to find apartment number 202, the apartment reported in the dispatch, because the apartment numbers at the complex had been recently renumbered. They did not note anything unusual, but observed O'Laughlin walking from the building on a walkway leading from apartment number 19. O'Laughlin was wearing only boxer shorts and Officer Tierney testified that O'Laughlin appeared "impervious" to the near-freezing temperature.

O'Laughlin questioned the officers regarding what had happened and the officers answered that they were responding to a report of a woman screaming. When they asked him if he had heard any screaming, O'Laughlin replied that he had been awakened by

-6-

screaming, but believed it to be a raccoon trapped in a dumpster.[5] O'Laughlin explained that he had placed a stick in the dumpster so that it could escape. Officer Tierney then looked inside the dumpster and saw a stick, but no animal. The SJC noted that during his conversation with the officers, O'Laughlin seemed "uneasy and distant," not making eye contact with them. The police further searched the area, but left after finding nothing suspicious.

Whittemore testified that throughout the night he heard a woman moaning and crying directly below him.[6] He also testified that later in the morning, he heard the sound of glass breaking, banging, and a man outside Mrs. Kotowski's apartment calling her name. The man subsequently yelled "Oh, my God."

The man Whittemore was referring to was Mrs. Kotowski's boyfriend, Finn, who had arrived at 5:45 a.m. at Mrs. Kotowski's apartment. On weekdays, Finn routinely joined Mrs. Kotowski for a morning coffee prior to starting his workday. On this particular morning, when Finn knocked on the door, he only heard her say, "Who is it?" in a strange voice. After failing to reach her from a nearby public telephone, Finn testified that he forced open a locked sliding glass rear door. Although the living room appeared to be in order, he found Mrs. Kotowski lying on the floor next to

---

[5] O'Laughlin's supervisor testified that the complex had been having problems with raccoons getting caught in the dumpster.

[6] Although he heard these sounds, Whittemore did not contact the police again that night.

the bed.  He testified that "there was just blood everywhere." Finn dialed 911 just before 6:30 a.m.  Mrs. Kotowski, who had severe wounds on her head, was taken to Berkshire Medical Center. The police ruled out Finn as a suspect because of his alibi (which they confirmed), his reaction of shock upon discovering Mrs. Kotowski, and his cooperation with the police.

Officers who arrived after Finn's 911 call observed blood in the victim's bedroom on the bed, the pillow, the floors, the walls, and on the door jambs of the bathroom and bedroom.  The SJC noted that the crime scene contained "'quite a bit of blood' that appeared to be 'splatters' on the comforter."  Further, the bed rail was dented, with wood splinters on the ground beneath the dent.  Officer Skowron testified that everything else was intact as the apartment was neat and nothing was displaced.  Mrs. Kotowski's purse was on the floor, however.  Officer Skowron also testified that there were no signs that the front door or the rear sliding door had been forced open (which contradicted a report by an earlier officer on the scene stating that the rear door was broken); that the drawers were closed; and that the light and figurines on the dresser were upright.  Mrs. Kotowski testified that no items of value were missing from the apartment.  These items, which were in plain view on top of the dresser, included diamonds, pearls, and an expensive watch in the bedroom.  Also, Mrs. Kotowski's purse contained her credit cards, about $28 in cash, and a checkbook.  There was $522 in cash in a dresser drawer.

Constance Cappel, a neighbor who lived in the apartment between O'Laughlin and Mrs. Kotowski, testified that she heard voices outside Mrs. Kotowski's apartment at about 6:45 a.m. Cappel went outside and saw Mrs. Kotowski being loaded into an ambulance. She knocked on O'Laughlin's door and told him that she thought someone had been murdered. O'Laughlin, who answered the door in his boxer shorts and looked like he had just awoken, responded "What do you want me to do about it?"

At 8:45 a.m. O'Laughlin came out of his apartment dressed for work, approached one of his co-workers and Cappel, and inquired about what was happening. After his co-worker explained the situation, O'Laughlin described his encounter with the police the previous night and how he had been awakened by the police cruisers. O'Laughlin also informed his co-worker that he told the police that he thought raccoons had been in the dumpster making a "kind of squealing sound."

At about 9:40 a.m., Officers Tierney and Todd Briggs talked with O'Laughlin outside the apartment building and Officer Tierney noticed a "scratch or a dig mark in [O'Laughlin's] left cheek, [a] small cut on his chin and a round, circular bruise . . . just below his left ear." Officer Tierney was unsure about how fresh these marks were.

The SJC remarked that although O'Laughlin was initially "reluctant," he agreed to give a statement at the police station when informed that Officer Tierney would conduct the interview.

O'Laughlin arrived at the station at 10:40 a.m., but was told by Chief Ronald Glidden to wait for Officer Tierney, who had yet to arrive.  Officer Tierney arrived twenty minutes later and told O'Laughlin that he would be "right with him."  However, when he returned five minutes later, O'Laughlin had left.[7]

O'Laughlin returned to the police station twenty minutes later and was interviewed by Chief Glidden for about ten minutes. Chief Glidden testified that O'Laughlin "seemed agitated" during the interview.  In his statement to Chief Glidden, O'Laughlin stated that he had been "drinking before he went to bed and he just didn't think he was awake until he heard the cruisers at approximately two o'clock."  He thought he may have heard foxes or raccoons before that, but was uncertain.  O'Laughlin said that he had "seen [the victim] around,"; that he and a friend had joked about her boyfriend; and that he had been in that apartment to repair a window.  After the interview concluded, he went home.

State Troopers David Buell and Brian Berkel arrived at the complex around noon.  Trooper Buell spoke to O'Laughlin, who stated that he had been out with his friend, Puleri, the previous night, returned at 10:30 p.m., went to sleep around 11:30 p.m., and was awakened by screaming, which he thought was a fox fighting with

_____

[7]  O'Laughlin's co-worker testified that O'Laughlin went back to the apartment complex and told him the person O'Laughlin was supposed to meet was not there.  After discussing the matter further, O'Laughlin decided to go back to the police station accompanied by his co-worker.

a raccoon. O'Laughlin said that a short time later the police arrived and he went out to speak with them. After the officers left, he slept until 7:30 a.m., when he was awakened by his neighbor, who had informed him that there had been a murder.

Trooper Buell asked O'Laughlin for consent to search his apartment in order to eliminate him as a suspect and because his apartment was in close proximity to Mrs. Kotowski's apartment. O'Laughlin consented, and allowed Trooper Berkel to take photographs and two police chemists to search for blood stains. Trooper Berkel photographed a red stain on a closet door near the kitchen area. A chemist who saw the stain asked O'Laughlin if his consent included taking swabbings. O'Laughlin responded that it did not. Soon thereafter, O'Laughlin asked the officers to leave his apartment.

Outside the apartment, the police decided to apply for a search warrant. They returned to O'Laughlin's apartment and informed him of their intent to secure the apartment and obtain a warrant. O'Laughlin replied that they did not need to pursue a warrant because he would allow them back into the apartment. He also told the officers that he had wiped the red stain off the closet door with his finger, and thought it was his own blood, but was not certain. O'Laughlin told the police that he was concerned about a search because he was afraid police would find his drug paraphernalia and because he possessed money that he did not want taken. Trooper Buell asked O'Laughlin to give him the drug

-11-

paraphernalia, telling him that he would not be charged with drug possession.

When the chemists returned to the apartment, the red stain on the closet door was gone. However, the area, where the stain had been, tested positive for the presumptive presence of blood. The chemists collected a sample by swabbing.[8]

A state trooper searched the area surrounding the apartment complex with a dog trained to search by scent. The dog found an aluminum bat about twenty-five yards away from a building's dumpster in the woods. It appeared to be covered in leaves and debris, but was otherwise clean. O'Laughlin's name was inscribed on the bat.

On November 20, O'Laughlin called a friend and informed him that he was a suspect in the assault. The SJC noted that O'Laughlin was "upset" while he told his friend that he was "very happy that [Mrs. Kotowski] had survived . . . [s]o that she could identify her assailant," but with his bad luck the assailant could have been wearing a "Nixon mask" and entered with a baseball bat.

---

[8] Chemists also collected swabs from two small, red-brown stains in the apartment that tested positive for the presumptive presence of blood, and cuttings of what appeared to be blood from O'Laughlin's bed comforter. O'Laughlin handed over to the police the clothes he said he wore the previous night and permitted the chemist to examine his boots.

Later that day O'Laughlin was arrested. While in custody, O'Laughlin told an inmate that although he owned the bat, he last saw it when he moved into his apartment.[9]

The police recovered fourteen fingerprints and one palm print from Mrs. Kotowski's apartment, none of which matched those of O'Laughlin.[10] In addition, footprint impressions taken at the apartment did not match O'Laughlin's boots. State Police Lieutenant Brian O'Hara, trained in fingerprint analysis and bloodstain patterns, opined that a blood stain on Mrs. Kotowski's pillow was caused by the transfer of blood from a person's right hand, but the handprint was unidentifiable. He testified that the hand had to have had a significant amount of blood on it, not all of which would have been transferred.

A state police chemist examined the aluminum bat found in the woods. Three small reddish brown stains on the bat tested positive for the presumptive presence of blood, only one of which tested positive for human blood. The three stains were swabbed and sent to the DNA unit for further testing. There was contamination in the DNA lab, and thus the tests consumed all the testable material without yielding results. An additional cutting from tape

---

[9] At booking, O'Laughlin remarked during his photograph that the mark on his face was a pimple. Trooper Michael Hill thought it was a blemish or an injury.

[10] Twelve of these prints were identifiable and excluded O'Laughlin; two were unidentifiable; and one was identifiable, but police could not match it to any known prints.

-13-

on the bat's handle, an area where the presumptive presence of blood could still be detected, was submitted to the laboratory. A state police DNA analyst concluded that while Mrs. Kotowski could not be excluded as a contributor, one in two of any randomly selected individuals could have been the contributor.[11]

A surgeon who performed reconstructive surgeries on Mrs. Kotowski after the attack testified that she had sustained between fifteen to twenty blows that broke nearly every bone in her face and skull. The only exception was her jaw. She also had defensive wounds on her hands caused by five to ten blows. The surgeon gave an opinion that Mrs. Kotowski's injuries were caused by a long, sturdy, hard, round object, consistent with an aluminum bat that was recovered in the woods on the day of the attack.

## B. Procedural History

In December 2000, A Berkshire County grand jury charged O'Laughlin with four offenses: (1) burglary and armed assault in a dwelling, see Mass. Gen. Laws ch. 266, § 14; (2) armed assault in a dwelling, see Mass. Gen. Laws ch. 265, § 18A; (3) armed assault with intent to murder, see Mass. Gen. Laws ch. 265, § 18(b); and

---

[11] Because of the contamination, only the following samples were deemed adequate for further testing: blood on Mrs. Kotowski's bathroom floor; a stain on the wall behind O'Laughlin's dresser; and two cuttings from O'Laughlin's comforter. Of these samples, it was concluded that all of the blood found in O'Laughlin's apartment belonged to him, and O'Laughlin was excluded as a possible contributor to the sample of blood taken from Mrs. Kotowski's bathroom.

(4) assault and battery by means of a dangerous weapon, see Mass. Gen. Laws ch. 265, § 15A(b).

Following a nine-day jury trial in May 2002, O'Laughlin was convicted of all four charges. O'Laughlin appealed.

### 1. The Massachusetts Appeals Court Opinion

On appeal, the Massachusetts Appeals Court concluded that there was insufficient evidence to support the jury's verdicts. The Appeals Court stated that while the government's evidence demonstrated that O'Laughlin had a motive of robbery, an opportunity to commit the crime, a means to commit the crime, and a consciousness of guilt, the evidence was not enough to establish guilt. The Appeals Court concluded that "[n]othing in the record sufficiently links the defendant to the crime to permit the conclusion beyond a reasonable doubt that he was the perpetrator" and that "[p]iling inference upon inference does not amount to proof beyond a reasonable doubt." O'Laughlin I, 830 N.E.2d at 231-32. In reaching its conclusion, the Appeals Court noted that the bat was only "consistent" with the weapon used in the attack; that O'Laughlin's lies to the police concerning his whereabouts and his removal of the stain from his closet door, "while certainly permissible to show a guilty conscience, cannot fill the gap in the proof of identity"; that O'Laughlin did not show physical strain in his appearance and demeanor when confronted by the police just about twelve minutes after the attack, which would have been

consistent with someone who had just committed such a "brutal" attack; and that the third-party culprit evidence in this case detracted from the government's case. Id. at 232-34. Thus, the Appeals Court reversed O'Laughlin's convictions and directed that judgments be entered in his favor.

## 2. The SJC Opinion

The Commonwealth then sought and received further appellate review from the SJC. The SJC concluded that the evidence against O'Laughlin had been sufficient and affirmed his convictions, stating that circumstantial evidence of motive, opportunity, means, and consciousness of guilt "permissibly convinced the jury of the defendant's guilt." O'Laughlin II, 843 N.E.2d at 627.

The SJC stated that the jury could permissibly find that O'Laughlin's motive to break into Mrs. Kotowski's apartment was robbery. Id. It pointed to the fact that O'Laughlin had taken drugs twice previously on the night of November 16, had "run out" of drugs and money, and was calling around as late as 1:43 a.m. to purchase drugs, which the SJC noted was "only twelve minutes before the victims' upstairs neighbor telephoned the police department to report screams and banging sounds from downstairs." Id.

The SJC further noted that O'Laughlin had previously entered the victim's apartment and "had reason to believe that she was wealthy and might have cash or valuables." Id. The SJC

-16-

commented that O'Laughlin "needed money immediately and the victim was a nearby and likely source." Id. Accounting for the fact that nothing was taken from the apartment, the SJC pointed to a reenactment during trial demonstrating that the neighbor could be heard in the apartment below when he called the police. The SJC concluded that "[i]t is a reasonable inference that the defendant was frightened off before he could steal anything when he heard the neighbor speaking." Id. at 627 n.11.

The SJC also concluded that O'Laughlin had the opportunity to commit the crime because he resided only two apartment doors away from Mrs. Kotowski and that he had a master key which gave him access to her apartment. Id. at 627. In addition, the SJC pointed to Whittemore's testimony that he did not hear any cars going to or from the apartment complex in the interval between when he first heard the screaming and when the police arrived. Id.

The SJC also reasoned that O'Laughlin had the means to commit the crime by stating that the aluminum bat was found a short distance from Mrs. Kotowski's apartment complex. Id. The SJC stated that "[t]he jury would certainly be warranted in concluding that the bat was the defendant's." Id. The SJC explained that "[h]is surname, not a common one, was visible on the bat handle and he mentioned to someone in jail that he was the owner of the bat the police had found." Id. The SJC further noted, however, that although the bat was covered by some leaves and debris, it was

-17-

otherwise "clean" when discovered. Id. It also acknowledged O'Laughlin's statement that he had not seen the bat since the day he had moved into his apartment. Id. at 627 n.12.

Most notably, the SJC indicated the significant evidence pointing to O'Laughlin's consciousness of guilt. Id. at 627. First, the SJC referenced O'Laughlin's demeanor when the police first arrived on the scene and discovered O'Laughlin outside in his "boxer shorts in near freezing temperature." Id. The SJC noted that when he talked with the police, he was "uneasy and distant" and did not make eye contact with the police officers. Id. Also, the SJC remarked that the differing versions O'Laughlin gave to police as to the reason he woke up was indicative of his untruthfulness.[12] Id. at 627-28. The SJC further noted that O'Laughlin reluctantly participated in an interview with the police and seemed "agitated" when he spoke with them. Id. at 628.

Moreover, the SJC pointed to O'Laughlin's reaction to the police's request when they asked for a swabbing of the red stain in the closet door of his apartment. Id. Although O'Laughlin later allowed the police to return, the stain was gone and O'Laughlin

_____

[12] The SJC stated that O'Laughlin lied to the police when he told them that he was awakened by the screaming, but his telephone records show that he was making phone calls until twenty minutes before the police arrived on the scene. He later told the police that the police cruisers woke him up. Also, he told the police in an another interview that he went to bed at 11:30 p.m., awoke to screaming that he believed were animals fighting, went back to sleep and awoke to his neighbor's knock on his door who was there to inform O'Laughlin that Mrs. Kotowski was severely beaten. Id. at 627-28.

-18-

admitted to having removed it with his finger, saying that he believed that it was his own blood. The SJC concluded that "[t]his evidence reflected not merely a general consciousness of guilt, but indicated that the defendant feared that the blood stain could be that of the victim, a fear he would have only if he were in fact the perpetrator." Id.

Finally, the SJC pointed to the fact that O'Laughlin had "a 'scratch or dig mark' on his cheek, a small cut on his chin and a bruise on his neck." Id. While acknowledging that the police officer could not discern whether the marks were "fresh," the SJC concluded that "it could be inferred that the injuries were sustained during a physical encounter with the victim." Id.

In sum, the SJC stated that the evidence taken together "was sufficient to permit the jury to determine beyond a reasonable doubt that the defendant was the perpetrator of the vicious attack on the victim." Id.

In reversing the lower appellate court decision, the SJC distinguished its case law in Commonwealth v. Mazza, 504 N.E.2d 630 (Mass. 1987), stating that in the instant case the prosecution "presented more evidence linking [O'Laughlin] to the assault." O'Laughlin II, 843 N.E.2d at 629. Furthermore, the instant case contained evidence of means as represented by the aluminum bat, "significantly stronger evidence of consciousness of guilt," bruises on O'Laughlin's face, and the fact that O'Laughlin was wearing only boxers when the police found him, which "would be

-19-

consistent with his having disposed of bloody outer garments." Id. With respect to O'Laughlin's attire, the SJC added that "[t]he jury could find that, had the defendant gone outside to check for animals in the dumpster (as he claimed), it was implausible that he would have done so without putting on at least minimal clothing, not only for purposes of protection against the cold but also for purposes of decency." Id.

The SJC disagreed with the weight placed by the Appeals Court on the fact that O'Laughlin "did not manifest any signs of recent physical exertion (sweat, shortness of breath, wet hair or disarray)" twelve minutes after the attack. Id. at 629 n.13. The SJC stated that this did not detract from the government's case because twelve minutes after the attack there would be no reason for O'Laughlin to show signs of this physical exertion. Id.

Also, the SJC disagreed with the Appeals Court that the third-party culprit evidence presented in this case detracted from the government's argument or affected the sufficiency of the evidence because it was not "so overwhelming that no rational jury could conclude that the defendant was guilty." Id. at 630. The SJC stated that the third-party culprit evidence "simply tended to contradict the Commonwealth's evidence; it did not show it to be

-20-

incredible or conclusively incorrect."[13]  Id. (internal quotation marks omitted).

### 3.  O'Laughlin's Habeas Petition

In his habeas petition before the district court, O'Laughlin alleged that (1) the evidence at trial was insufficient

---

[13]  The SJC noted O'Laughlin's third-party culprit evidence in a footnote:

> The defense sought to portray the victim's husband, from whom she had recently separated, as the third-party culprit.  The husband was aware of the wife's new address and that she was involved with another man.  The victim described the husband as being "upset" but not angry about this relationship.  Others said the husband alternated between being "nice" and verbally abusive. The husband testified that he was at home at the time of the assault and that he received two telephone calls just before 6 a.m.  Each time his "caller ID" indicated the source of the call as the victim's apartment, but no one was on the line.  He dialed the number, and a man answered.  One witness thought he saw the husband's car in his workplace parking lot at approximately 6 a.m. on the morning of the attack, but a neighbor saw the husband's car parked at home at 6:20 a.m.  The husband was generally cooperative with the police, but did not permit the police access to "personal" letters to his wife.  Tests indicated the presumptive presence of blood on one of the husband's forearms on the day of the attack.  On the evening of November 17, the police observed garbage bags on the floor of the husband's garage and dark clothing in a clothes dryer.  Two wet towels strongly smelling of bleach were found in a plastic bag in the trunk of the husband's car.  One of the towels was the same as towels found in the victim's linen closet.  The husband explained that the towels smelled because he did not know how to do laundry and had used too much bleach on them.  He said he brought them on a hunting trip the previous weekend and had forgotten them in the trunk.  Finally, the husband kept wooden baseball bats and other athletic equipment in his garage.

Id. at 630 n.14.

to prove that he was a perpetrator of the offenses for which he was convicted; and (2) the trial court violated his right to present a defense by excluding a handwritten note that, according to O'Laughlin, supported his third-party culprit defense. After briefing by the parties and a non-evidentiary hearing, the district court denied O'Laughlin's petition reasoning that "like the courts that have looked at this cold record before me, this is a close question. But the petition must be under federal law denied."

O'Laughlin then filed a timely notice of appeal and requested a Certificate of Appealability ("COA") as to his sufficiency and right-to-present a defense claims. The district court granted a COA with respect to both issues.

## II. Discussion

### A. Standard of Review

We review de novo the district court's decision to grant or deny a habeas petition under 28 U.S.C. § 2254. Healy, 453 F.3d at 25. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1219 (1996), a federal court shall not grant a petition for habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court decision: 1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or 2) "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "A state court's findings on factual issues 'shall be presumed to be correct' and the petitioner bears the burden of disproving factual findings by 'clear and convincing evidence.'" McCambridge, 303 F.3d at 34-35 (quoting 28 U.S.C. § 2254(e)(1)).

Sufficiency claims are generally[14] evaluated under § 2254(d)(1) and we look to "whether the state court decision constitutes an unreasonable application of clearly established Supreme Court case law." Hurtado v. Tucker, 245 F.3d 7, 15 (1st Cir. 2001) (quoting Williams v. Matesanz, 230 F.3d 421, 426 (1st Cir. 2000)).

"[T]he 'unreasonable application of' prong of § 2254(d)(1) 'reduces to a question of whether the state court's derivation of a case-specific rule from the [Supreme] Court's generally relevant jurisprudence appears objectively reasonable.'" Id. at 16 (quoting Matesanz, 230 F.3d at 425).

---

[14] Although an analysis under § 2254(d)(1) is appropriate in the present case, we say "generally" because we need not conclude that we must "evaluate a state court's resolution of a Jackson sufficiency-of-the-evidence claim in all cases under § 2254(d)(1) rather than § 2254(d)(2)." Sarausad v. Porter, 479 F.3d 671, 678 (9th Cir. 2007) (emphasis added), rev'd on other grounds sub nom. Waddington v. Sarausad, 129 S. Ct. 823 (2009); cf. id. at 695 (Reinhardt, J., concurring in part and dissenting in part) ("I see nothing in law or logic preventing us from evaluating Jackson claims under § 2254(d)(2), which authorizes us to grant habeas relief when the state court decision we are reviewing is 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" (quoting § 2254(d)(2)).

-23-

"Habeas review involves the layering of two standards. The habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted." Id.

The constitutional right asserted in sufficiency of the evidence claims is set forth by the Supreme Court's decision in Jackson v. Virginia, 443 U.S. 307 (1979). Under Jackson, due process requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof - defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Id. at 316. More succinctly, the relevant test we take from Jackson is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original).

Thus, for our purposes, we must decide whether the SJC's application of Jackson to O'Laughlin's case was "objectively unreasonable." Although "[t]he term 'unreasonable' is no doubt difficult to define," Hurtado, 245 F.3d at 17 (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)), we have explained that "some increment of incorrectness beyond error is required." McCambridge, 303 F.3d at 36 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)). "The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the

-24-

independent and objective judgment of the federal court." Id.[15] To be sure, "the gap between erroneous state court decisions and unreasonable ones is narrow," Evans v. Thompson, 518 F.3d 1, 6 (1st Cir. 2008), and "it will be the rare case that will fall into this gap," id. (citing Williams, 529 U.S. at 388). However, for an erroneous decision to be unreasonable, judicial incompetence is not necessary and "a case will fall into this narrow gap precluding relief only when 'it is a close question whether the state decision is in error.'" Id. at 7 (quoting McCambridge, 303 F.3d at 36) (emphasis in original). "'It is enough if the Supreme Court's general principles can be discerned and if, respectfully but with confidence,' the federal court concludes that the state court unreasonably applied federal law." Id. (quoting White, 399 F.3d at 25).

---

[15] We also note "that a state-court adjudication of an issue framed in terms of state law may receive section 2254(d)(1) deference so long as the state standard is at least as protective of the defendant's rights as its federal counterpart." Leftwich v. Maloney, 532 F.3d 20, 23-24 (1st Cir. 2008); see also White v. Coplan, 399 F.3d 18, 23 (1st Cir. 2005) (explaining that a federal habeas court may "infer that the federal claim was considered if the state court rejects a counterpart state claim and then cites to a case holding that the federal constitution provides no greater protection"). Even though the SJC did not cite Jackson, we have no qualms with its analysis in this respect. The SJC relied on Massachusetts case law that has expressly adopted the federal constitutional standard in Jackson. See Commonwealth v. Latimore, 393 N.E.2d 370, 375 (Mass. 1979); see also Leftwich, 532 F.3d at 24 ("Because the Latimore court adopted the governing federal constitutional standard as the Massachusetts standard for sufficiency of the evidence challenges, . . . we can securely reason that in scouring the record for Latimore error and finding none the SJC effectively answered the federal constitutional question.") (citations omitted).

Further, in our inquiry of objective unreasonableness the question "is not how well reasoned the state court decision is, but whether the outcome is reasonable." Hurtado, 245 F.3d at 20. We note that just because an opinion is poorly reasoned does not "mean that the outcome represents an unreasonable application, although . . . it is certainly ground for further inquiry if the state court ignores material facts." Id. (internal citation omitted). "'It is not necessary that the federal court agree with every last detail of the state court's analysis. By like token, state courts are not required to supply the specific reasons that a federal court thinks are most persuasive for upholding the judgment.'" Healy, 453 F.3d at 28-29 (1st Cir. 2006) (quoting Bui v. DiPaolo, 170 F.3d 232, 243 (1st Cir. 1999)).

As a final note, we emphasize the great degree of deference state court judgments are due, especially those that uphold jury verdicts.[16]

_____

[16] For example, in Hurtado, we explained:

> [A]s a general rule, federal courts should be particularly cautious about issuing habeas, on grounds of the objective unreasonableness of a state court's conclusion that the evidence is sufficient, where there has been a verdict of guilt by a jury of a defendant's peers, where the defendant's credibility was evaluated by the jury hearing his testimony, where that verdict has been affirmed on appeal in the state system, and where there is no claim of constitutional error in the conduct of the trial. Even on direct appeal, claims that the evidence was insufficient to support the verdict are "often made, but rarely successful."

245 F.3d at 19-20 (quoting United States v. Moran, 984 F.2d 1299,

### B.  Applicable Law

#### 1.  The <u>Jackson</u> Standard

Turning to the underlying constitutional right asserted here, O'Laughlin maintains that his due process rights were violated because after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have identified him as the assailant beyond a reasonable doubt.  <u>See</u> <u>Jackson</u>, 443 U.S. at 319 ("whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original); <u>United States</u> v. <u>Ayala</u>, 289 F.3d 16, 25 (1st Cir. 2002) ("Identification of the defendant as the person who committed the charged crime is always an essential element which the government must establish beyond a reasonable doubt.") (quotation marks and citations omitted).

"The <u>Jackson</u> standard is as easy to articulate as it is difficult to apply."  <u>Newman</u> v. <u>Metrish</u>, 543 F.3d 793, 796 (6th Cir. 2008); <u>see generally</u> Hon. Jon O. Newman, *Beyond "Reasonable Doubt,"* 68 N.Y.U. L. Rev. 979 (1993) (discussing difficulty of defining term); Note, *Reasonable Doubt: An Argument Against Definition*, 108 Harv. L. Rev. 1955 (1995) (same).  This is particularly the case where we have no eyewitness to identify the perpetrator.  In cases based on circumstantial evidence such as the

1300 (1st Cir. 1993)).

instant case,[17] "we face head-on the disturbing truth that guilty verdicts rest on judgments about probabilities and those judgments are usually intuitive rather than scientific." Stewart v. Coalter, 48 F.3d 610, 614 (1st Cir. 1995).

Despite the lack of precision in determining what constitutes reasonable doubt and the inherent difficulty in defining the term, this court and others have attempted to explicate the standard. For example, we have stated that "[g]uilt beyond a reasonable doubt cannot be premised on pure conjecture. But a conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely." Id. at 615-16.

As we have stated on multiple occasions, "'[b]eyond a reasonable doubt' does not require the exclusion of every other hypothesis; it is enough that all 'reasonable' doubts be excluded." Id. at 616 (quoting United States v. Oreto, 37 F.3d 739, 753 (1st Cir. 1994)); see also United States v. Dwinells, 508 F.3d 63, 74 (1st Cir. 2007); United States v. Olbres, 61 F.3d 967, 976 (1st Cir. 1995); United States v. Brown, 603 F.2d 1022, 1025 (1st Cir. 1979) ("The prosecution may prove its case by circumstantial

---

[17] Like the SJC, we acknowledge that to pass constitutional muster, direct evidence of identification is not necessary. "Identification can be inferred from all the facts and circumstances that are in evidence." Ayala, 289 F.3d at 25 (quotation marks and citations omitted).

-28-

evidence, and it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.").

We note that although the circumstantial evidence is permissible to discern the identity of the perpetrator, there are some limits to its probative value. "[A] reviewing court should not give credence to 'evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" Leftwich, 532 F.3d at 23 (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)); see also United States v. Valerio, 48 F.3d 58, 64 (1st Cir. 1995) ("we are loath to stack inference upon inference in order to uphold the jury's verdict"). Further,

> [i]f the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction. This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt.

United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995) (alterations, ellipses, and emphasis in original) (internal quotation marks omitted).

Although we give great deference to jury verdicts, we have held that evidence may sometimes be insufficient to sustain a jury verdict of guilt beyond a reasonable doubt. See, e.g., United States v. García-Torres, 280 F.3d 1, 6 (1st Cir. 2002) (holding

-29-

evidence insufficient to show proof beyond reasonable doubt that defendant knew he was aiding in drug conspiracy when participating in kidnapping and murder); United States v. Blasini-Lluberas, 169 F.3d 57, 62-64) (1st Cir. 1999) (holding evidence insufficient to support convictions of bank officer on four of five counts of misapplication of bank funds); United States v. Morillo, 158 F.3d 18, 24 (1st Cir. 1998) (holding evidence insufficient to support inference of knowledge of conspiracy's purpose); United States v. Czubinski, 106 F.3d 1069, 1073-74 (1st Cir. 1997) (holding evidence insufficient to show defendant intended to carry out a scheme to defraud the IRS under wire fraud statute); United States v. de la Cruz-Paulino, 61 F.3d 986, 1001 (1st Cir. 1995) (holding evidence insufficient to support conviction for aiding and abetting where prosecution failed to show defendant shared the specific intent of the principal); Valerio, 48 F.3d at 65 (holding evidence insufficient to support a finding of intent to distribute cocaine).

### C. Analysis of the SJC Opinion

As our sister court has noted, "[a]lthough circumstantial evidence alone can support a conviction, there are times that it amounts to only a reasonable speculation and not to sufficient evidence." Newman, 543 F.3d at 796. This is such a case.

The instant facts may support a reasonable speculation that O'Laughlin was the assailant, but not sufficient evidence to establish his guilt. Taken together, the circumstantial evidence

in this case, even when drawing all reasonable inferences in favor of the prosecution, does not permit any rational jury to conclude that O'Laughlin was the assailant beyond a reasonable doubt.

Specifically, the evidence that O'Laughlin acted upon a financial motive to commit the attack is weak at best. A jury could permissibly conclude that he needed money to acquire crack cocaine, giving him reason to break into Mrs. Kotowski's apartment, a person whom he knew had money. However, Mrs. Kotowski testified that nothing of value was taken and no items, not even expensive jewelry in plain view, were disturbed. The SJC accounted for this fact by stating that the jury could draw "a reasonable inference that the defendant was frightened off before he could steal anything when he heard the neighbor [Whittemore] speaking." O'Laughlin II, 843 N.E.2d at 627 n.11. Even if the assailant deduced that the neighbor was calling the police in response to the attack,[18] no rational juror could conclude that the placement of this phone call frightened him off given the volume and duration of Mrs. Kotowski's screams. Moreover, the assailant's actions are inconsistent with O'Laughlin's purported financial motive in view of the savage beating Mrs. Kotowski suffered at the hands of the assailant, an attack involving at least fifteen to twenty blows that nearly broke every bone in her face and skull. If the

---

[18] A reenactment demonstrated that the assailant would not have been able to make out that Whittemore was calling the police.

-31-

assailant were motivated by money, a few blows to incapacitate her would have been sufficient.

With respect to the opportunity to commit the crime, O'Laughlin had a master key and there were no signs of forced entry; thus, one possible inference is that O'Laughlin used his master key to enter Mrs. Kotowski's apartment. It is notable, however, that several others on the maintenance staff possessed a master key. Also, Mrs. Kotowski could have let someone familiar to her into the apartment.

With respect to the means for the attack, a jury could permissibly find that the aluminum bat found in the woods was O'Laughlin's bat given that his name was on the bat and that he admitted to owning the bat at one time. Yet, there was little evidence connecting the aluminum bat, a non-unique item in a residential complex, to the crime scene apart from the fact that it was found twenty-five yards from the residential complex the following day and the use of such an object was "consistent" with Mrs. Kotowski's injuries.[19] Of course, any bat likely would have been consistent with her injuries. Also, Whittemore, a carpenter, testified that he heard "wood hitting wood," as opposed to hearing

_____

[19] This is not to say that each of us is convinced that the state court's decision is unreasonable in every respect. But this case comes to us on arguments as presented by the parties. This panel may not be in complete unanimity in all particulars, but we do agree that the petitioner has the better of the argument with respect to the means evidence introduced by the prosecution at trial.

-32-

the sound of a hollow aluminum bat, when he was awakened. Furthermore, wooden bats were found in Mrs. Kotowski's estranged husband's garage.

We next turn to O'Laughlin's consciousness of guilt, which the SJC considered the strongest evidence in favor of reinstating the conviction.[20] When viewed in context, this evidence is minimally probative on the question of whether O'Laughlin was the assailant.

Notwithstanding the fact that it was just after 2:00 a.m., the SJC cited to O'Laughlin's "uneasy and distant" demeanor and his unwillingness to look Officers Tierney and Skowron in the eye when they confronted him just minutes after the attack. However, both officers, even though they were responding to reports of a possible assault, did not consider O'Laughlin's behavior suspicious at the time. Indeed, they initially believed he was the reporting party and after asking him a few brief questions they left the area. Even the fact that O'Laughlin was only clad in boxers in near-freezing temperature did not give them pause after he explained to them that he was awakened by animal screams and had gone outside to place a stick in the dumpster, a fact Officer

---

[20] We compare infra the consciousness of guilt evidence in our case to that of Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005). In Juan H., the Ninth Circuit granted habeas relief to a petitioner in part because it viewed that any conclusion regarding the petitioner's guilt based on the prosecution's consciousness of guilt evidence amounted to no more than "bare conjecture." Id. at 1277.

Tierney promptly verified.  Also, the SJC explained that a jury could find it "implausible" that O'Laughlin would have gone outside without "putting on at least minimal clothing" if his true reason for going outside was to check for animals.  Yet, Officer Tierney stated that O'Laughlin appeared unfazed by the cold and O'Laughlin's alibi shows that he did not intend to stay outside for a very long time.

The other consciousness of guilt evidence cited by the SJC -- O'Laughlin's reluctance to be interviewed by the police, the inconsistent versions of how he was awoken, his reaction to the neighbor's report of an assault, the fact that he was agitated during the interview, and his reaction when the police wanted to swab his closet door -- while not helpful to his case, are not enough, even when considered in combination with other circumstantial evidence, to allow a jury to permissibly conclude O'Laughlin's guilt beyond a reasonable doubt.

With respect to this evidence, the fact that O'Laughlin was reluctant to come down to the police station and displayed some agitation during the interview has minimal probative value in determining whether O'Laughlin was the assailant.  Although this behavior could indicate consciousness of guilt for some crime, such as possessing crack cocaine (which the evidence shows he admitted to being concerned about), it is an impermissible inferential leap for a jury to find this behavior significantly probative of whether

O'Laughlin committed such a brutal attack.[21]  Likewise, his indifferent reaction to his neighbor informing him of the attack the following morning may bear on whether he was a compassionate person, but has little probative value in assessing O'Laughlin's guilt.

Admittedly, the conflicting versions O'Laughlin gave the police as to how he was awoken and his reaction to the police's request to swab his closet door when they were searching his home could be probative evidence linking O'Laughlin to the crime. However, in light of O'Laughlin's concerns that the police would discover his drug use, this evidence was insufficient to serve as the primary basis upon which the jury could rely to conclude O'Laughlin's guilt beyond a reasonable doubt.

Lastly, the SJC cited bruises and marks on O'Laughlin's face as evidence from which the jury could infer that an altercation occurred between O'Laughlin and Mrs. Kotowski. However, these bruises and marks have minimal, if any, probative force given the fact that they were not even noted by Officers Tierney and Skowron when they were responding to an assault just minutes after the attack.

It bears repeating that the prosecution had to rely on circumstantial evidence because no physical or DNA evidence linked

---

[21]  This is not a case where the defendant stonewalled the police. He approached the police just minutes after the attack, he submitted to a ten-minute interview with the Chief of Police, and ultimately allowed the police to search his apartment.

-35-

O'Laughlin to the attack despite the copious amount of blood at the crime scene. Considering the large amount of blood, it is difficult to fathom how O'Laughlin was able to avoid having any blood or other DNA evidence connect him to Mrs. Kotowski. Given the insufficiency of the evidence, circumstantial or otherwise, tying O'Laughlin to the attack, we conclude that a rational jury could not find O'Laughlin's guilt beyond a reasonable doubt.

**D.  Objectively Unreasonable Standard for Purposes of Habeas Review**

Although we have identified several gaps in the SJC's analysis, we are mindful that on habeas review under AEDPA we are not permitted to grant a writ if we merely disagree with the jury verdict or if we identify an error in the SJC's reasoning. The relevant inquiry is whether the SJC was objectively unreasonable in upholding the conviction.

We once again acknowledge the extremely high bar that must be overcome on habeas review to overturn a state court decision; however, that bar is not insurmountable and on rare occasions we have held a state court decision to be objectively unreasonable. See, e.g., White, 399 F.3d at 25 (holding on habeas review that state court unreasonably applied Supreme Court's Confrontation Clause jurisprudence where state court barred petitioner from cross examining complainants regarding prior accusations).

This court has identified certain guidelines that it finds useful in analyzing sufficiency claims on habeas review.[22] In addition, we note that although we evaluate the state court decision in light of Supreme Court precedent, we are not precluded from looking at other federal court decisions that may help guide us in applying the Jackson standard. Indeed, "'[d]ecisions from the lower federal courts may help inform the AEDPA analysis to the extent that they state the clearly established federal law determined by the Supreme Court.'" Evans, 518 F.3d at 10 (alteration in original) (quoting Aspen v. Bissonnette, 480 F.3d 571, 574 n.1 (1st Cir. 2007)). This is especially true when "'factually similar cases from the lower federal courts' can 'provid[e] a valuable reference point' when considering the

---

[22] These include:

> (1) The focus of the inquiry is on the state court decision;
> (2) Even with the deference due by statute to the state court's determinations, the federal habeas court must itself look to "the totality of the evidence" in evaluating the state court's decision;
> (3) The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;
> (4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and
> (5) The absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness.

Hurtado, 245 F.3d at 18.

reasonableness of a state court's application of Supreme Court precedent to a particular set of facts." Id. (alteration in original) (quoting Rashad v. Walsh, 300 F.3d 35 (1st Cir. 2002)). Under § 2254(d)(1), we are not constrained in our "ability to draw from any legal source in determining whether the state court's decision rests on constitutional error or is an unreasonable application of Supreme Court precedent. [Section 2254(d)(1)] only limits the grounds on which habeas relief may be granted." Id.

With this in mind, we look to a recent case, Newman v. Metrish, where the Sixth Circuit held a state court ruling to be objectively unreasonable on grounds that the prosecution did not present sufficient evidence to support a prosecution for murder of a known drug dealer. 543 F.3d at 797. In Newman, the prosecution presented evidence at trial that the petitioner planned to rob drug dealers for drugs or money; that the victim was a known drug dealer who kept drugs in his freezer; that the petitioner and the victim were known to engage in drug transactions in the past; that the victim's freezer was "open and empty" after he was killed; and that the petitioner had a motive for the killing because he had seen the victim "make a pass" at the petitioner's girlfriend. Id. at 794. Furthermore, the prosecution presented evidence supporting an inference that Newman had possessed and once purchased the murder weapon. Id. This evidence included forensic evidence and the fact

that the petitioner's friend saw a gun similar to the murder weapon in the petitioner's home a few weeks prior to the murder.[23] Id.

In analyzing the evidence under Jackson, the Newman court stated that even when "consider[ing] all of the evidence in the light most favorable to the prosecution, there remains reasonable doubt because we are limited by what inferences reason will allow us to draw." Id. at 797. It remarked that these limitations included its ability to "infer only that [the petitioner] intended to rob a drug dealer and knew that [the victim] was a drug dealer, that a gun previously owned by [the petitioner] was used to kill [the victim], and that a similar looking gun was seen in [the petitioner's] home approximately two weeks before the murder." Id. The Newman court added that "even assuming that [the petitioner's] gun was indeed the one used in the homicide, there was no evidence of what happened to it between that date and the date of the homicide, and we need not speculate as to what might have happened." Id.

The Newman court reasoned that while there was "a wealth of information showing that [the petitioner] owned the gun,"

---

[23] With respect to the murder weapon, the Newman court acknowledged that "the prosecution offered ample evidence to support an inference that [the petitioner] had previously possessed at least one of the murder weapons." Id. at 795. However, it noted that "the prosecution did not offer any evidence that [the petitioner] had used or possessed the weapons on the day of the murder," any "eyewitness testimony," any "latent fingerprints from the crime scene or the items in the gym bag" in which the alleged murder weapon was found. Id.

"evidence placing [the petitioner] at the scene" was "conspicuously absent." Id. at 797. It pointed to the fact that there was no eyewitness testimony and the police did not recover any fingerprints from the crime scene. Id. The Newman court stated that "[w]ithout additional evidence placing [him] at the scene of the crime, there is only a reasonable speculation that [the petitioner] himself was present." Id. It concluded that "where the evidence taken in the light most favorable to the prosecution creates only a reasonable speculation that a defendant was present at the crime, there is insufficient evidence to satisfy the Jackson standard." Id. Accordingly, the Newman court declared the state court ruling an unreasonable application of clearly established federal law. Id.

While Newman's reasoning certainly does not control our analysis, it is significant that our sister court ruled a state court decision to be objectively unreasonable under Jackson on facts more probative of a petitioner's guilt than what we have here. For example, O'Laughlin, like the petitioner in Newman, was not connected to the crime scene by forensic evidence or eyewitness testimony; however, unlike the petitioner in Newman who had prior business dealings with the victim in that case, O'Laughlin had minimal contact with the victim apart from a few casual conversations and a maintenance call. Moreover, the petitioner's robbery motive in Newman was consistent with the evidence -- as the victim's freezer, which was his storage place for drugs, was open

and empty.[24]  In the instant case, however, O'Laughlin's alleged motive of robbery to satisfy his need for crack cocaine does not align with the fact that nothing of value was taken from Mrs. Kotowski's apartment or with how savagely she was beaten at the hands of her assailant.  Lastly, in Newman, the petitioner owned a gun whose spent cartridges and bullets matched those found in the victim's body.  Here, the aluminum baseball bat that O'Laughlin owned was merely "consistent" with Mrs. Kotowski's injuries, in the same way a metal pipe or some other long, sturdy object would be consistent with her injuries.

Another decision from a sister court also informs our analysis as to whether the SJC unreasonably applied the Jackson standard.  In Juan H. v. Allen, the Ninth Circuit held that the state court decision was objectively unreasonable because there was insufficient evidence to conclude that a juvenile petitioner aided and abetted a principal in committing first-degree murder and first-degree attempted murder.  408 F.3d at 1278-79.

In Juan H., the state court had concluded that the petitioner had "manifested consciousness of guilt" because he fled from the crime scene; he attempted to leave his home with his family after the shooting; and he gave a false alibi to the police that he was in a trailer and not present during the shooting.  Id.

---

[24]  Even if, in Newman, the petitioner's motive was anger because the victim had made a pass at the petitioner's girlfriend, the victim's gunshot wound is not inconsistent with this motive.

at 1277. Also, as motive evidence, the state court cited petitioner's gang gestures towards the victim and the fact that the petitioner had punched the victim on a prior occasion. Id.

With respect to the evidence of flight, the Juan H. court reasoned that "[n]o reasonable trier of fact could find evidence of criminal culpability in the decision of a teenager to run home from the scene of a shooting, regardless of whether the home was in the same general direction as the car of a fleeing suspect." Id. The Juan H. court added that "[l]ikewise, any rational factfinder would find little or no evidence of guilt in the fact that [the petitioner] attempted, along with the rest of his family, to leave his home as it was being surrounded by an angry mob of neighbors." Id.

Regarding the false alibi, the Juan H. court remarked that it was "bare conjecture" to regard the petitioner's untrue statements to the police as reflective of consciousness of guilt. Id. The court explained that the petitioner "might have made a false statement to law enforcement for any number of reasons, especially given that any statements he made as a witness would likely be used to prosecute his older brother, a member of his immediate family." Id. The Juan H. court stressed: "Although we must draw all reasonable inferences in favor of the prosecution, a 'reasonable' inference is one that is supported by a chain of logic, rather than, as in this case, mere speculation dressed up in the guise of evidence." Id.

-42-

Finally, the Juan H. court stated that the prosecution's motive evidence was mere conjecture, reasoning that the "interpersonal tensions" between the petitioner and the victim "do not create a sufficiently strong inference of motive to allow a reasonable trier of fact to conclude beyond a reasonable doubt that [the petitioner] had reason to aid and abet first-degree murder." Id. at 1278.

The Juan H. court maintained that "[s]peculation and conjecture cannot take the place of reasonable inferences and evidence -- whether direct or circumstantial -- that [the petitioner] -- through both guilty mind and guilty act -- acted in consort with [the principal]." Id. at 1279. Applying the Jackson standard to the state court decision, the Juan H. court ruled that "only speculation . . . supports a conclusion" that the petitioner was guilty of aiding and abetting the first-degree murders. Id. It concluded that "[s]uch a lack of evidence violates the Fourteenth Amendment guarantee that an accused must go free unless and until the prosecution presents evidence that proves guilt beyond a reasonable doubt." Id. (citing In re Winship, 397 U.S. 358, 365-68 (1970)).

Admittedly, the facts in Juan H. do not line up precisely with those of the instant case. However, we find instructive the Juan H. court's treatment of its consciousness of guilt evidence.[25]

---

[25] As we stated above, here the SJC viewed its consciousness of guilt evidence to be most probative of O'Laughlin's guilt.

The Juan H. court held that the petitioner's lies about his presence at the crime scene and the fact that he fled the area were insufficient to support an inference that he aided and abetted the murderer, reasoning that a conclusion regarding the petitioner's guilt from this evidence would be no more than "bare conjecture."

The evidence in Juan H. is far more reflective of consciousness of guilt than what we have here. Unlike the petitioner in Juan H., O'Laughlin was not caught in a lie about whether he was present at the crime scene and did not flee the scene of the crime. In fact, O'Laughlin approached the police just minutes after the attack.[26] Similar to the Juan H. court's reasoning, this consciousness of guilt evidence constituted "bare conjecture" regarding O'Laughlin's guilt and thus renders the SJC decision that relied primarily on this evidence, objectively unreasonable.

We reiterate that Juan H. and Newman, while not controlling, powerfully illustrate how federal courts, acting under the AEDPA regime, can hold in appropriate circumstances state court decisions to be objectively unreasonable when applying Jackson.

---

[26] As explained above, O'Laughlin's interactions with the police immediately after the assault and the day after, while not irrelevant, did not constitute sufficient evidence for a rational jury, even combined with the other circumstantial evidence, to conclude he was the assailant. Again, it may have been permissible for the jury to find that O'Laughlin possessed consciousness of guilt of some crime, such as drug possession, for which the evidence showed there was some basis, but not of a vicious attack on a neighbor with whom he had very little prior contact.

Our sister courts' reasoning in these cases underscore why we believe habeas relief should be granted in the instant case.

Our holding is further bolstered by a post-AEDPA case of our own, Leftwich v. Maloney, where a petitioner claimed there to be insufficient evidence for a state court to correctly identify him as the perpetrator of the offense for which he was convicted. See Leftwich, 532 F.3d at 21. Although we held that habeas relief was not warranted in Leftwich, it is helpful to consider the factors we considered relevant.

In Leftwich, the petitioner argued that there was insufficient evidence to conclude that he was a principal rather than an accessory to the murder of a bishop who had taken the petitioner in when he was released from prison. Id. In holding that there was sufficient evidence to support a guilty verdict, the Leftwich court considered that the petitioner confessed to being in the same place, a ditch, within minutes of when the murder occurred; that the police recovered from the petitioner a Leatherman tool whose length and width were consistent with the victim's wounds; that he "embarked on a wide-ranging cleaning spree" shortly before his arrest; that forensic evidence included fingerprint evidence and the victim's blood on the petitioner's clothes and hands; that the petitioner lied about having any knowledge of the victim's death; that the petitioner's motive resulted from the victim's disapproval of the petitioner's use of company credit card to satisfy a gambling debt; and that the

-45-

"record [was] barren of any evidence as to who besides the petitioner could have inflicted the fatal stab wounds." Id. at 25-27.

We note the many distinguishing features of the instant case as compared to Leftwich. Specifically, unlike the petitioner in Leftwich, there was no physical or forensic evidence linking O'Laughlin to the crime scene; O'Laughlin's financial motive was inconsistent with the evidence in Mrs. Kotowski's apartment; and O'Laughlin presented compelling third-party evidence that Mr. Kotowski was the actual assailant. We recognize that the stronger evidence supporting the petitioner's guilt in Leftwich, when compared to the present case, is not persuasive by itself to render the evidence insufficient here. However, the fact that the instant facts satisfy very few of the criteria the Leftwich court considered relevant in its Jackson analysis, provides additional support for our conclusion here that the SJC's decision to reinstate the conviction was objectively unreasonable.

We acknowledge the many strands of circumstantial evidence the prosecution has presented in this case; however, when viewing this evidence in its totality, as we must do on habeas review, that evidence is far from sufficient to establish O'Laughlin's guilt under Jackson. Based on the record before us and drawing all reasonable inferences in favor of the prosecution, we hold that it would be overly speculative to conclude O'Laughlin to be the assailant beyond a reasonable doubt. Accordingly, we

-46-

conclude that the SJC's decision to uphold O'Laughlin's conviction was objectively unreasonable.

### III.  Conclusion

Because double jeopardy principles apply here, we remand to the district court to order O'Laughlin's unconditional release with prejudice to reprosecution.  See Burks v. United States, 437 U.S. 1, 18 (1978) (holding that "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient"), quoted in Foxworth v. Maloney, 515 F.3d 1, 2 (1st Cir. 2008).[27]

**Reversed and Remanded for action consistent with this opinion**.

---

[27]  O'Laughlin also claims that the SJC, in concluding that the trial judge properly excluded a note O'Laughlin alleged to have supported his third-party culprit defense, violated his constitutional right to present a defense.  In view of our holding regarding O'Laughlin's Jackson claim, we need not reach this issue.