**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 18-1282
_____


JAMAR L. TRAVILLION,
                                        Appellant

v.

SUPERINTENDENT ROCKVIEW SCI;
DISTRICT ATTORNEY ALLEGHENY COUNTY

_____


On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa No. 15-cv-0677)
Chief District Judge:  Honorable Mark R. Hornak

_____


Argued December 10, 2019

Before:  RESTREPO, ROTH, and FISHER, *Circuit Judges*

(Opinion filed: December 15, 2020)

Lisa B. Freeland, Federal Public Defender
Kimberly R. Brunson        [Argued]
Office of Federal Public Defender
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA  15222

*Counsel for Appellant*

Stephen A. Zappala, Jr., District Attorney
Rusheen Pettit          [Argued] *
Keaton Carr
Emily B. Grawe
Office of District Attorney of Allegheny County, Pa.
436 Grant Street, Room 401
Pittsburgh, PA  15219

*Counsel for Appellees*

---

OPINION OF THE COURT

---

RESTREPO, *Circuit Judge*


Jamar L. Travillion appeals the District Court's dismissal of his petition for writ of habeas corpus under 28 U.S.C. § 2254.  Travillion was convicted in the Court of Common Pleas of Allegheny County of robbery in violation of 18 Pa. C.S. § 3701(a)(1).  In support of his request for habeas relief, Travillion argues, among other things, that his constitutional right to due process was violated because the evidence introduced at trial was insufficient to support a finding that he was guilty beyond a reasonable doubt.

Because we conclude that the Pennsylvania court's adjudication of petitioner's insufficient evidence claim involved an unreasonable application of clearly established federal law enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979), we reverse the Order of the District Court denying habeas relief, and we remand with instructions to grant the Petition for Writ of Habeas Corpus, and issue the writ.

**I.**

At trial, the Commonwealth's case consisted of the testimony of two witnesses: (1) Deborah Lynn Diodati, the

---

* Participated via video conference.

manager of the store that was robbed; and (2) Detective John J. Godlewski, a fingerprint expert.

Ms. Diodati testified that she was the store manager of Rainbow Apparel on February 24, 2003. She arrived for work late at 9:30 a.m. because it was "[s]nowing pretty bad" and "the roads were pretty bad." App. 93. Although company policy prohibited an employee from entering the store prior to operating hours without another employee, Ms. Diodati decided to enter the store alone because she had just spoken to her assistant manager who was not going to arrive on time.

Ms. Diodati unlocked the front door, entered, and turned around to lock the door when she noticed someone behind her. She described a person in a winter jacket, who carried a Manila folder in his left hand. She stepped toward the door to say the store was not open as the person "reached for the door." App. 95-96. The person then "pushed his way inside, [and] told [her] numerous times to turn off the alarm." App. 96.

Ms. Diodati turned off the alarm, and the person "grabbed ahold of [her] arm and motioned [her] to walk towards the cash wrap," the place where the cash registers and a small safe were located. App. 97. Ms. Diodati testified that the safe was "underneath the counter inside a door" and that "from plain view you wouldn't be able to see it." App. 99. The intruder then demanded money from the safe, and Ms. Diodati knelt onto the floor. As the robber knelt on the floor beside her, she opened the safe and extracted two envelopes, which each contained two to three hundred dollars, and handed them to the robber. She testified as follows:

> Q. Did you reach down and open the lockbox?
> A. Yes, I did. I was actually kneeling on the floor.
> Q. What did he do at that point?
> A. He was kneeling on the floor beside me.

3

Q. What did you notice?

A. Well, after I had handed him the envelopes with the money in it, he set the folder that he had had on the floor; and, also, he set his gun down, which had been the first time I had seen it, in between us and reached in to make sure there was nothing left in the safe.

App. 99-100. When the robber stood up, he picked up the gun but left the folder on the floor.

After checking to make sure there was no more money left in the safe, the robber grabbed Diodati by her arm, and told her they were going to the second safe, which was in her office, to get the rest of the money. Ms. Diodati testified that, other than herself, "nobody but my district manager and my other assistants knew about" that second safe. App. 101, 105. On the way to the second safe, Ms. Diodati was scared and made a comment that she had children, to which she thought the robber responded, "I know." App. 103.

In the process of going to the office, the intruder "reached up and very forcefully ripped" a sliding "accordion" door "almost off the hinges." App. 103. Once in her office, Diodati opened the other safe. She then handed the robber two bank deposit bags containing approximately $6,000, which the robber placed into a green bag he had strapped over his shoulder.

Ms. Diodati testified that she began to cry, and the robber told her he wanted to go out the back door, which led to a parking lot and required another alarm to be turned off. Diodati unlocked the back door, and the intruder then ran from the building across a parking lot to a four-door Ford Taurus automobile, which had the motor running. The robber entered the front passenger side of the vehicle, and the driver then pulled away.

Once the robber left, Diodati locked the back door, ran to the front of the store, locked the front door, and called the police. While she was talking to the police on the phone, she

4

looked at the floor and saw the folder and papers were still there.

After the police arrived and she was conveying the events to them, Diodati pointed out the Manila folder and papers. She was unable to identify Travillion as the robber since the robber's face was covered. As to a description of the robber, she testified:

> Q. Now, talking about the description of the actor at the time this took place, what do you remember about the physical appearance of the individual that robbed you that day?
>
> A. Probably first and foremost, he was very well spoken. Probably about 5'9", 5'10", just judging from his height compared to mine. He had a big, bulky jacket on, but I assumed – he wasn't – he was probably athletically built, maybe like 160 or so.
>
> Q. Could you estimate how old this individual was?
>
> A. Probably in his early to mid twenties.
>
> Q. How about ethnicity? Anything indicate to you whether he might have been African-American? Hispanic?
>
> A. His voice led me to believe he could have been African-American, yes.

App. 112-13. She also noted that he wore dark pants and a big off-white winter coat with fur around the hood, and he had a turtle neck pulled up to his nose and a woman's stocking over the top of that, with the hood of his jacket pulled down so she "never really saw his face." App. 113. At trial it was stipulated that the police report at the time of arrest reflected that Travillion was 6'1" tall and weighed 170

pounds. He had black, straight and short hair, brown eyes, medium complexion, medium frame build, a "U.S. region" accent, and a pierced left ear. App. 152.

The robbery occurred at 9:30 a.m. on a Monday, and Ms. Diodati testified that an armored car would pick up money from the store on Mondays, Wednesdays, and Fridays, normally arriving between 10:15 and 11:30 in the morning. Approximately $7,000 was stolen that day.

Detective Godlewski testified that he processed for fingerprints on the counter, the sliding accordion door that the robber tore partially off its hinges, and several other areas. The Manila folder with some papers inside it, identified by the detective as "some type of math [or] geometry papers" left behind by the intruder were also processed for latent prints. App. 134, 136. The detective also took "two scaled photographs of shoe impressions out the back door in the snow behind the business." App. 132. The detective testified that he never received any shoes to make a comparison to the photographs he had taken at the scene.

The police were able to obtain two left thumbprints, a left ring finger print, and a left middle finger print on the Manila folder, and one left thumbprint on one of the papers that had been inside the folder. After submitting these fingerprints for comparison, it was determined that they belonged to Travillion.

Detective Godlewski testified there were no other prints of value recovered on the items. With regard to the door that was torn from its hinges, Detective Godlewski testified that although a latent fingerprint of value was retrieved, it was determined to not be that of Travillion, and the detective did not identify the person to whom the print belonged. The only fingerprints identified as belonging to Travillion were those on the Manila folder and one of the papers carried into the scene by the robber. The detective further testified that people can touch things without leaving a fingerprint, and that it was possible that someone other than Travillion touched the Manila folder but did not leave fingerprints.

## II.

On December 21, 2006, a jury found Travillion guilty of the robbery. On January 3, 2007, Travillion was sentenced to a mandatory 10 to 20 years in prison, to run consecutively to the separate sentence of life without the possibility of parole that he was serving at the time as a result of a separate conviction for second-degree murder on February 21, 2006. Travillion filed a post-sentence motion in the trial court asserting that the evidence was insufficient to support his conviction in violation of his constitutional right to due process. That motion was denied by operation of law on August 29, 2007.

On direct appeal to the Superior Court of Pennsylvania, Travillion raised his sufficiency of the evidence claim. The Superior Court affirmed the judgment of sentence by Order and Memorandum of November 5, 2008. Travillion's application for reargument before the Superior Court *en banc* was denied on January 12, 2009. In February of 2009, he filed a Petition for Allowance of Appeal in Pennsylvania's Supreme Court, which was denied on July 7, 2009. Travillion did not seek *certiorari* with the United States Supreme Court.

On May 21, 2010, Travillion filed a pro se petition for relief under Pennsylvania's Post-Conviction Relief Act ("PCRA"). Subsequently-appointed counsel filed a motion for leave to withdraw and a no-merit brief in support of the motion. On August 19, 2013, the PCRA Court dismissed the PCRA petition without a hearing.

Travillion filed a pro se appeal in the Superior Court, and the Superior Court affirmed the denial of his PCRA petition on February 10, 2015. He did not seek allowance of appeal to Pennsylvania's Supreme Court.

On June 2, 2015, Travillion filed a pro se habeas petition under 28 U.S.C. § 2254 in the United States District Court. On July 17, 2017, a Magistrate Judge issued a Report and Recommendation ("R&R") recommending dismissal of the petition. With regard to the insufficient evidence claim, the R&R pointed to the testimony that the robber carried the

Manila folder with his left hand into the store and that Travillion's fingerprints from the left hand matched those found on the folder and paper. On January 19, 2018, the District Court adopted the R&R as the Opinion of the Court, dismissed the habeas petition, and denied a certificate of appealability ("COA").

On appeal, our Court granted Travillion's request for a COA on his claims that there was insufficient evidence to support his conviction and that his rights under the Confrontation Clause of the Sixth Amendment were violated.[1] In granting the COA, with respect to the insufficient evidence claim, the COA Order cited *United States v. Strayhorn*, 743 F.3d 917, 922-23 (4th Cir. 2014), and *Mikes v. Borg*, 947 F.2d 353, 357 (9th Cir. 1991), in support thereof.

## III.

The District Court had jurisdiction over the habeas petition pursuant to 28 U.S.C. § 2254. We have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253. Our review of the District Court's decision is plenary. *See Showers v. Beard*, 635 F.3d 625, 628 (3d Cir. 2011). Thus, we review the Pennsylvania court's adjudication of the merits of the insufficient evidence claim on Travillion's direct appeal under the same standard that the District Court was required to apply, namely, the standard provided in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).[2]

---

[1] Travillion raises his Confrontation Clause claim on appeal, in the alternative. *See* Appellant's Br. 64. Because we agree that habeas relief is warranted based on his insufficient evidence claim, we need not reach his Confrontation Clause claim.

[2] With regard to his claim of insufficient evidence, it is undisputed that Travillion has satisfied the exhaustion requirement for habeas petitions under § 2254 and that the Pennsylvania courts adjudicated the merits of this claim on Travillion's direct appeal.

Pursuant to AEDPA,

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Here, Travillion argues the Pennsylvania court's denial of his insufficient evidence claim resulted in a decision that "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." S*ee id.*[3] He further argues that the Pennsylvania court's decision

---

[3] There is no dispute that the Superior Court applied Pennsylvania's equivalent of the U.S. Supreme Court's *Jackson v. Virginia* standard to Travillion's insufficiency of the evidence claim. *See Eley v. Erickson*, 712 F.3d 837, 848 (3d Cir. 2013) (holding that Pennsylvania's test for insufficient evidence "do[es] not contradict *Jackson*"); *Evans v. Ct. of Common Pleas, Del. Cty.*, 959 F.2d 1227, 1232 (3d Cir. 1992) ("the test for insufficiency of the evidence is the same under both Pennsylvania and federal law").

was based on an unreasonable determination of the facts, in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), "[a] state court decision is an unreasonable application . . . if the court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case." *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005) (internal quotation marks omitted). "[T]he state court's application of clearly established law must be objectively unreasonable before a federal court may grant the writ." *Rountree v. Balicki*, 640 F.3d 530, 537 (3d Cir. 2011) (internal quotation marks omitted). In determining whether a state court's application of clearly established Supreme Court law is objectively reasonable, we may consider the reasoning of federal courts below the level of the Supreme Court. *Marshall v. Hendricks*, 307 F.3d 36, 71 n.24 (3d Cir. 2002) ("We have concluded . . . that decisions of federal courts below the level of the United States Supreme Court may be helpful to us in ascertaining the reasonableness of state courts' application of clearly established United States Supreme Court precedent, as well as helpful amplifications of that precedent") (internal quotation marks omitted).

## V.

When a petitioner alleges entitlement to habeas relief by challenging the sufficiency of the evidence supporting his state court conviction, as Travillion does, the clearly established federal law governing the insufficient evidence claim is the standard set out by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See, e.g., Eley*, 712 F.3d at 847 ("The clearly established federal law governing Eley's [insufficient evidence] claim was determined in *Jackson*"). Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)).

This reasonable doubt standard of proof requires the finder of fact "to reach a subjective state of *near certitude* of

10

the guilt of the accused." *Id.* at 315 (citing *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)) (emph. added). It "'plays a vital role in the American scheme of criminal procedure,' because it operates to give 'concrete substance' to the presumption of innocence to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding." *Id.* (quoting *Winship*, 397 U.S. at 363). A conviction that fails to satisfy the *Jackson* standard violates due process, *see Jackson*, 443 U.S. at 319, and thus a convicted habeas petitioner is entitled to relief if the state court's adjudication denying the insufficient evidence claim was objectively unreasonable, s*ee Parker v. Matthews*, 567 U.S. 37, 43 (2012).

In this case, there is no dispute that the relevant Pennsylvania statute for robbery was violated. The question on appeal is whether there was sufficient evidence for a rational trier of fact to identify Travillion as the perpetrator of the robbery, in other words, placing him at the scene of the crime during the robbery, beyond a reasonable doubt, and ultimately, whether the Pennsylvania court's denial of relief on Travillion's direct appeal was objectively unreasonable, in light of the evidence in this case.

In the last reasoned Pennsylvania court decision adjudicating the merits of Travillion's insufficient evidence claim, the Superior Court concluded that the fingerprints on the Manila folder and paper left at the crime scene were sufficient to prove Travillion's identity as the robber. In support of this conclusion, the Superior Court stated: "Diodati testified that the envelope was in the left hand of the robber and, thus, not in common usage. Furthermore, the Commonwealth proved that the fingerprints came from the left hand of Travillion." App. 293.

In *Mikes v. Borg*, 947 F.2d 353 (9th Cir. 1991), a pre-AEDPA habeas case, a state prisoner convicted of first degree murder appealed the District Court's Order dismissing his § 2254 petition. *Id.* at 355. The prosecution's case against Mikes rested upon the fact that his fingerprints were found in the victim's non-public basement on three chrome posts from a disassembled turnstile found near the victim's body, including the post identified as the murder weapon. *Id.* Thus,

the prosecution's case rested on the theory that Mikes' fingerprints were impressed on these objects *during the commission of the crime*. *Id.* at 356. Although other prints were on the posts and throughout the crime scene, none of the fingerprints found anywhere at the crime scene except on the posts was identified as Mikes'. *Id.* at 356.

The Ninth Circuit in *Mikes* pointed out, "In order to support a finding that Mikes is guilty beyond a reasonable doubt, the record must demonstrate that he in fact touched the posts *at the time the crime was committed* and not at some earlier point." *Id.* at 359 (emph. added). The Court further stated, "In cases such as [this], there must, at the very least, be sufficient evidence in the record to determine *when* the fingerprints were impressed; otherwise, any conviction would be based on pure speculation." *Id.* at 357. The Court noted the lack of evidence as to the age of the fingerprints found on the posts and the defense expert's testimony that fingerprints can last indefinitely, which the Ninth Circuit noted is "consistent with the testimony of government experts in other cases." *Id.* at 358 (citing cases of other Circuits). "Under our judicial system, the defendant has no duty to explain the presence of his fingerprints." *Id.* at 359.

Holding that Mikes' conviction failed to meet the *Jackson* standard, the Ninth Circuit granted habeas relief, recognizing that "to allow this conviction to stand would be to hold that anyone who touches anything which is found later at the scene of a crime may be convicted." *Id.* at 361 (quoting *Borum v. United States*, 380 F.2d 595, 597 (D.C. Cir. 1967)). The Court concluded that "[a]ny determination that Mikes' fingerprints were left on the posts during the commission of the offense is unreasonably speculative." *Id.*

In *United States v. Strayhorn*, 743 F.3d 917 (4th Cir. 2014), two defendants allegedly robbed a store at gunpoint and bound the store's owner with duct tape. *Id.* at 920. However, the prosecution's fingerprint expert witness "conceded that he had no way to determine when [the defendant's] fingerprint was imprinted on the tape." *Id.* at 923. On the defendant's direct appeal, in applying the *Jackson* standard, the Fourth Circuit held that a defendant's fingerprint found on duct tape used to bind a robbery victim

12

was insufficient to support his conviction for robbery where the expert could not determine when the print had been imprinted on the tape.  *Id.*

The Court concluded that "in challenges to convictions involving fingerprints on movable objects, in the absence of evidence regarding when the fingerprints are made, the [prosecution] must marshal sufficient additional incriminating evidence so as to allow a rational juror to find guilt beyond a reasonable doubt."  *Id.* at 923.  "Although the [prosecution] may meet this burden with circumstantial evidence, the evidence must be sufficiently incriminating to support the conviction."  *Id.*

In Travillion's case, "Appellees acknowledge that the crux of the Commonwealth's case against [Travillion] was the fingerprint evidence."  *See* Appellees' Br. 32.  They also acknowledge that Ms. Diodati's physical description of the perpetrator did not match Travillion's characteristics, but they argue it was at least close enough not to exclude him.  So essentially the only evidence linking Travillion to the crime was the fingerprint evidence on the Manila folder and paper, plus the fact that Travillion's characteristics were, at best, close enough to the witness' description of the robber not to *exclude* him.  That is not enough to reasonably conclude that the *Jackson* test was satisfied here.  Evidence that Travillion's fingerprints were found on the easily movable Manila folder and a paper inside the folder carried into the store by the robber and a witness' description of the robber that does not match Travillion but doesn't necessarily exclude him is not sufficient evidence for a rational trier of fact to place Travillion at the scene of the crime at the time the crime was committed beyond a reasonable doubt.

Applying the Supreme Court's *Jackson* standard, in viewing the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences from the evidence, no rational trier of fact could have found Travillion was the perpetrator of the crime for which he was convicted *beyond a reasonable doubt.  See Jackson*, 443 U.S. at 319. Further, we conclude that the Pennsylvania court's decision denying Travillion's insufficient evidence claim was an objectively unreasonable application of Pennsylvania's

13

equivalent of the Supreme Court's *Jackson* standard. *See Jacobs*, 395 F.3d at 100; *see also White v. Woodall*, 572 U.S. 415, 426 (2014) ("a state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule (here, *Jackson*) but applies that rule unreasonably to the facts of a particular prisoner's case") (parenthetical added). In coming to these conclusions, we are mindful, as *Jackson* instructs, that "a federal habeas court must consider not whether there was *any* evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 312-13.

Travillion's fingerprints were only found on easily movable objects, *i.e.*, the Manila folder and the paper, and there was no evidence of his prints anywhere else at the crime scene. There was no evidence that the folder and paper were unavailable to Travillion prior to the robbery, no evidence as to the age of the prints, and no evidence as to how long the prints could remain on the folder and paper after their impression. Appellees acknowledge that the fingerprint expert was unable to say when the prints were placed on the folder and paper.[4]

---

[4] The Pennsylvania Superior Court and the District Court cited *Commonwealth v. Hunter*, 338 A.2d 623, 624 (Pa. Super. 1975), and *Commonwealth v. Cichy*, 323 A.2d 817, 818 (Pa. Super. 1974), which predate *Jackson*, in support of the denial of Travillion's insufficient evidence claim. In *Hunter*, a burglar entered a building through a broken window, ten feet off the ground, that had been covered with sheet metal a week prior to the burglary because of a broken pane of glass. *Hunter*, 338 A.2d at 624. The defendant's fingerprint was found on the metal, and an expert testified that the print was no more than two weeks old. *Id.* The defendant had been in the building within that time period asking about a job, so theoretically, he could have left the print then. *Id.* The Court concluded, however, that the possibility that the defendant touched the sheet metal ten feet off the ground during that visit was "extremely remote." *Id.* Therefore, the fingerprint was sufficient evidence to convict. *Id.* By contrast, in *Cichy*, the defendant's fingerprint was

In addition to the absence of evidence regarding when Travillion's fingerprints on the easily movable folder and paper were impressed, there was a lack of sufficient additional incriminating evidence, circumstantial or otherwise, so as to allow a rational juror to find guilt beyond a reasonable doubt. Although there is evidence that Travillion touched the folder at some indefinite time with his left hand, and there is evidence that the robber carried the folder at the time of the crime in his left hand, there is not sufficiently incriminating evidence that Travillion was the perpetrator holding the folder at the time of the crime.

Ms. Diodati's description of the offender, at best, merely does not exclude Travillion as the perpetrator. Among other things, Diodati testified that she never saw the robber's face, and when asked if "[a]nything indicate[d] to [her] whether he might have been African-American? [or] Hispanic?," she replied, "His *voice* led me to believe he *could* have been African-American." App. 112-13 (emph. added). It is undisputed that Travillion was actually three to four inches taller than the offender described by the witness. The general description given by the witness in this case was insufficient additional incriminating evidence for any rational

---

found on a package of cigarettes on the floor in a burglarized gas station, and the fingerprint expert did not offer an opinion as to when the print was impressed. *Cichy*, 323 A.2d at 818, 819. The Superior Court reversed the conviction, holding that "if the prints are discovered on an object that is readily [m]ovable and [i]n common usage, the possibility of innocent contact is too great to sustain a conviction on that evidence alone." *Id.* at 819. Here, the fingerprints used to convict Travillion are unlike the fingerprints in *Hunter*, which were left on a relatively immovable object in a relatively inaccessible spot within two weeks of the robbery. And the fingerprints used to convict Travillion share some of the same weaknesses as those in *Cichy* (as well as *Mikes* and *Strayhorn*): the evidence could not reasonably support a finding that the prints were impressed during the crime beyond a reasonable doubt. Thus, unlike in *Hunter*, and like in *Cichy*, the fingerprints are insufficient to support the conviction under *Jackson*.

trier of fact to find Travillion guilty of being the robber beyond a reasonable doubt.

The witness' testimony also revealed the robber had knowledge about the store unknown to the general public, including, among other things, the store's layout and inner offices, the existence and location of a second safe known only to store management and assistants, and (possibly) that the witness had children. The timing of the robbery also suggests the robber knew when a large amount of cash would be present before the armored car pickup. There was no evidence, however, that Travillion was privy to any of this information.

There was no evidence connecting Travillion to the robbery, such as evidence he owned clothing worn by the intruder, or that he owned a bag similar to the one used during the crime, or that he had any connection to the getaway vehicle, or possessed any of the robbery's proceeds. There was also no evidence of any attempt to match the photographed shoeprint at the crime scene with shoes owned by Travillion, or even his shoe size.

Ms. Diodati's testimony included that she observed the robber holding the folder in his left hand, setting the folder on the floor beside her, grabbing her arm multiple times, setting his gun on the floor beside her, reaching into a safe, picking up his gun, "very forcefully ripp[ing]" a sliding door "almost off the hinges," and she handed the robber the contents of each of the two safes and watched him place the deposit bags into his green shoulder bag. Ms. Diodati further testified that on the morning of a "pretty bad" snow storm, the intruder was wearing a "big, bulky" winter coat with fur around the hood, a turtle neck pulled up to his nose, and had the hood of his coat pulled down.

Thus, the witness' testimony included numerous detailed observations involving the robber's hands, as well as testimony that the robber was wearing winter clothes on the morning of a significant snow storm in addition to wearing a stocking over his head to hide his identity. However, despite the obvious significance of needing to prove that the fingerprints on the easily movable items were impressed by

16

Travillion during the commission of the crime, the prosecution elicited no testimony that Diodati ever saw the robber's bare hand or that the intruder was not wearing gloves, let alone that she saw him holding the folder or paper with his bare hand.

We conclude that it was objectively unreasonable for the Pennsylvania court to decide that, after viewing the evidence in the light most favorable to the prosecution, a rational juror could have found Travillion guilty beyond a reasonable doubt. In particular, under the circumstances in this case, it was objectively unreasonable to apply the *Jackson* standard and deny relief on Travillion's claim that there was insufficient evidence to support a conclusion that Travillion was the robber that carried the folder and paper during the commission of the crime beyond a reasonable doubt. Any determination that Travillion's fingerprints were left on the folder and paper during the commission of the offense is unreasonably speculative.[5]

## VI.

For the foregoing reasons, we reverse the Order of the District Court denying habeas relief and remand for the District Court to issue the writ in connection with his robbery conviction, with prejudice to re-prosecution. *See, e.g., O'Laughlin v. O'Brien*, 568 F.3d 287, 309 (1st Cir. 2009) (citing *Burks v. United States*, 437 U.S. 1, 18 (1978)) ("Because double jeopardy principles apply here, we remand to the district court to order O'Laughlin's unconditional release with prejudice to reprosecution."); *see Burks*, 437 U.S. at 18 ("Since we hold today that the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, the only just remedy available for that court is the direction of a judgment of acquittal.") (internal quotation marks omitted).

---

[5] Having found habeas relief is warranted because the State court's adjudication of Travillion's insufficient evidence claim involved an unreasonable application of clearly established law set out by the Supreme Court in *Jackson*, we need not reach Travillion's remaining claims in support of his request for habeas relief.